JEFFREY L. HOGUE, ESQ. (SBN 234557)
TYLER J. BELONG, ESQ. (SBN 234543)
BRYCE A. DODDS, ESQ. (SBN 283491)
**HOGUE & BELONG**
430 Nutmeg Street, Second Floor
San Diego, CA 92103
Telephone No:  (619) 238-4720
Facsimile No:   (619) 270-9856
*jhogue@hoguebelonglaw.com*
*tbelong@hoguebelonglaw.com*
*bdodds@hoguebelonglaw.com*

DAVID R. MARKHAM, ESQ. (SBN 071814)
PEGGY REALI, ESQ. (SBN 153102)
JANINE MENHENNET, ESQ. (SBN 163501)
MAGGIE K. REALIN, ESQ. (SBN 263639)
**THE MARKHAM LAW FIRM**
750 B Street, Suite 1950
San Diego, CA 92101
Telephone No.: (619)399-3995
Facsimile No.: (619) 615-2067
*dmarkham@markham-law.com*
*preali@markham-law.com*
*jmenhennet@markham-law.com*
*mrealin@markham-law.com*

Attorneys for Plaintiffs

## UNITED STATES DISCTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| Greg Garrison,  individually and  on behalf of all others similarly situated; | CASE NO.: 5:14-cv-04592-LHK |
| vs. | **FIRST AMENDED ANTITRUST CLASS ACTION COMPLAINT** |
| Oracle Corporation, a Delaware corporation; | |
| Defendant. | DEMAND FOR JURY TRIAL |
| | **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED.** |

Greg Garrison ("Garrison" or "Plaintiff"), individually and on behalf of all others similarly situated, (collectively, "Plaintiffs") allege the following:

## I.    INTRODUCTION

1.      This class action is brought by Plaintiff, on behalf of himself, and on behalf of all others similarly situated, who have sustained injuries or incurred damages arising from Defendants' (defined below) violations of the antitrust and unfair competition laws of the United States and the State of California.

2.      This class action challenges (1) a conspiracy among defendant Oracle ("Defendant" or "Oracle") and by and among various other technology companies, including but not limited to, Google, Intuit, Adobe, and IBM, to fix and suppress the compensation of their employees by way of a series of secret agreements (collectively, the "Secret Agreements").

3.      The Secret Agreements were also entered into with non-technology based companies.  Specifically, Oracle would agree not to solicit employees from the aforementioned companies' technology *departments*, and vice versa.  The accounting firm Deloitte & Touche was one such company that Oracle had reciprocal anti-solicitation agreements.

4.      Further, the Secret Agreements extended to recruiting companies that place candidates that work in the technology field, where the recruiting firm would have an agreement with Oracle not to recruit Oracle employees.

5.      The Secret Agreements came that suppressed the wages of skilled labor came in many forms.  For instance, with Google, it was a so-called Restricted Hiring Agreement (defined below).  As another example, Oracle had Intuit on a "no-hire" list, which was then confirmed through email correspondence by human resources employees from both companies.

6.      Additionally, the Secret Agreements often came in the form of so-called "gentleman's agreements" where the CEOs of certain companies would agree orally not to solicit one another's employees.

7.      Plaintiff is informed and believes that technology companies, and the technology

-1-

FIRST AMENDED ANTITRUST CLASS ACTION COMPLAINT

departments of other companies, included a plethora of companies not listed above.

8.    These companies involved in the conspiracy shall be referred to herein sometimes as unnamed "parties," "co-conspirators," or "co-participants."

9.    The intended and actual effect of this conspiracy amongst technology companies, the technology departments of non-technology based companies, and companies that recruited for them, outlined below was to fix and suppress employee compensation, and to impose unlawful restrictions on employee mobility.

10.    Oracle's conspiracy and agreements restrained trade and the overarching conspiracy has been deemed *per se* unlawful under federal and California law.  Plaintiff seeks injunctive relief and damages for violations of: Section 1 of the Sherman Act (15 U.S.C. § 1); the Cartwright Act (Cal. Bus. and Prof. Code §§ 16720, *et seq.*); and California Business and Professions Code sections 16600 and 17200, *et seq.*

11.    Plaintiff petitions this Court to allow him to represent and prosecute claims against Defendants in this class action proceeding on behalf of all those similarly situated who are residents of the State of California.  This class action is brought under Rule 23 of the Federal Rules of Civil Procedure.

## **JURISDICTION**

12.    This Court has subject matter jurisdiction over this action under 15 U.S.C. sections 4 and 16, and 28 U.S.C. sections 1331 and 1337.

13.    This Court has personal jurisdiction over Defendant because it has its principal place of business in the state of California, employed individuals in the state of California during the class period, and has had substantial contacts within the state of California in furtherance of the injuries and conspiracy described herein.

14.    Venue is proper in this judicial district under 15 U.S.C. section 22 and 28 U.S.C. section 1391(b)(1)-(2) because a substantial part of the acts or omissions giving rise to the claims set forth herein occurred in this judicial district, a substantial portion of the affected interstate trade and commerce was carried out in this district.

**INTRADISTRICT ASSIGNMENT**

15.     Under Civil Local Rule 3-2(c) and (e), assignment of this case to the San Jose Division of the United States District Court for the Northern District of California is proper because a substantial part of the events and omissions which give rise to Plaintiff's antitrust claims occurred within the county of San Jose.

**PARTIES**

16.     Plaintiff Garrison, an individual, is a former employee of Oracle.  Mr. Garrison worked for Oracle from approximately December 2008 to June 2009.

17.     Plaintiff was a Senior Account Manager who managed sales of Oracle's Crystal Ball software to the North East United States and Eastern Canada.  Crystal Ball was a spreadsheet-based software used for predictive modeling, forecasting, simulation, and optimization across various business industries.

18.     Defendant Oracle is a Delaware corporation with its principal place of business located at 500 Oracle Parkway, Redwood Shores, CA 94065.

19.     Oracle is a U.S.-based multinational computer technology corporation.  It specializes in developing and marketing computer hardware systems and enterprise software products – particularly its own brands of database management systems.  Oracle is the second-largest software maker by revenue, after Microsoft.

20.     Oracle also builds tools for database development and systems of middle-tier software, enterprise resource planning (ERP) software, customer relationship management (CRM) software and supply chain management (SCM) software.

**FACTUAL BACKGROUND**

**THE CONSPIRACY**

21.     Technology employees of all types, such as Plaintiff, are in high demand because they, among other things, have technology related skills and/or can manage employees who work in specialized technology areas.

FIRST AMENDED ANTITRUST CLASS ACTION COMPLAINT

22.      Oracle established a "no-hire" list to prevent other technology companies from hiring its employees in exchange for Oracle's agreement not to hire those other firms' employees.  On Oracle's HR webpage, there is a dropdown menu to either accept or reject a candidate.  One of the options to reject a candidate is "works for company on the Do Not Hire List."

23.      Oracle would have these "no-hire" and anti-solicitation agreements in place with various other companies that would periodically change.  More important, however, is that there were technology companies, such as Intuit, who were permanent fixtures on the "do not hire" list – companies that had no end date (or the end date listed as "perpetual"), nor any written justification for not being able to recruit. ████████████████████████████████████████████████████████████████████████████████████████

24.      Other companies, such as IBM and Adobe, did not appear on Oracle's "do not hire" list, but had so-called gentleman's agreements with Oracle, not to solicit each other's employees.

25.      Intuit was a company that appeared in Oracle's "do not hire list," without an end date.  In fact, Intuit acknowledged that it had an anti-solicitation and no-hire agreement with Oracle.  In an email, an Intuit recruiting employee stated the following:

> . . . can we make an offer to him after he signs on as a consultant **and not be in violation of non-solicitation clauses from Oracle** (where he is employed)? . . .

> . . . I think it may be better to talk to him about the open position first before he gets engaged with us, **due to no-hire clauses from both companies' [Oracle and Intuit] perspective**. . .

26.   ████████████████████████████████████████████████████████████████████████████████████

FIRST AMENDED ANTITRUST CLASS ACTION COMPLAINT

27.     Oracle's "no-hire" list would change could change on a moment's notice.  For instance, Safra Catz (Oracle's CEO/CFO) could give the directive to an Oracle higher up employee about a so-called gentleman's agreement whereby the target company was off-limits as far as recruitment of one of its employees.  These directives were often times never added to the "no-hire" lists, and instructed to be kept "highly confidential."

28.     In May 2007, Oracle and Google entered into a "Restricted Hiring" agreement.  The "Restricted Hiring" agreement was a Secret Agreement.  Pursuant to that Secret Agreement which Oracle, Google, and the other technology companies who were a party, they agreed to the following:

> "1) Not to pursue manager level and above candidates for Product, Sales, or G&A roles – even if they have applied to [any of the other companies who are parties to the Restricted Hiring Agreement]"

29.     Google' recruiting and human resource department would regularly make sure that it was adhering to the Secret Agreement.  For instance, in an email dated October 9, 2007,

30.     Senior executives at Oracle, including Amanda Gill, Christina Crowley (an Oracle VP, for its Global License Management Services), Larry Ellison and Safra Catz, reached Secret Agreement with Google through direct, and explicit communications.  The executives actively managed and enforced these Secret Agreements through direct, and indirect communications.

-5-

31.     If companies violated these Secret Agreements they would be subjected to monetary fines to threats of a lawsuit.

32.     The penalties would typically range from $5,000 to $25,000.  In an email dated January 23, 2008, ████████████████████████████████████
████████████████
████████
██████████████████████████████████████
███████████████████████████████████████
████

33.     Regarding threats of lawsuits, on one occasion, Oracle was infuriated that Adobe breached the Secret Agreement and "poached" one of Oracle's employees ████████████
████████████████████████████████████████████████
████████████████████████████████████████
████ The aforementioned "poaching" led to ████████████████████████████████████
██████████████████████████████████ threatening to file a lawsuit.  Oracle had no knowledge or evidence that its former employees were divulging trade secrets, yet it threatened ████ with a lawsuit anyway as a means to punish them for breaching the Secret Agreement.  This letter was a direct response by Adobe recruiting Oracle employees.

34.     This tactic (threatening lawsuits) to anyone that was recruited by another technology company was commonplace at Oracle.

35.     Sometimes Oracle followed through and filed a lawsuit against a former employee for working with one of their partners purely for vengeful purposes.

36.     In an e-mail dated June 4, 2007, Oracle employee ████ memorialized a non-solicitation agreement with Deloitte.  In that e-mail she stated, ████████████████████
████████████████████████████████████████████████
██████████████████████████████████████

-6-
FIRST AMENDED ANTITRUST CLASS ACTION COMPLAINT

1       37.     Oracle was careful not to disseminate a written policy regarding their anti-

2    solicitation practices.  At times, however, those agreements were memorialized via an email.

3    For instance, in an e-mail dated June 8, 2007, █████ sent an email to her recruiting team, with

4    the subject line ████████[1] and stating the following:



15       38.     In an email dated November 30, 2007, █████████ sent an email to

16    ███████████ that complained about Oracle "poaching" some of ████

17    employees.  In response █████ contacted the HR department and stated, ████████

18    ████████

19       39.     In another email, dated January 2, 2008, an Oracle recruiter mistakenly sent an

20    email blast email out to someone who works for a company who was on the no-hire list.  The

21    matter was escalated to higher-ups at Oracle, and an Oracle Senior Director Recruiting stated

22

23

24

25

26

27

---

[1] "Partners" in Oracle's parlance does not mean a joint venturer for purposes of developing new technologies, but simply another entity with whom Oracle had an anticompetitive agreement.

FIRST AMENDED ANTITRUST CLASS ACTION COMPLAINT



1    40.    On January 16, 2008, ▓▓▓▓ sent an e-mail to an Oracle recruiter with the

2    subject line, ▓▓▓▓    In it she stated:

3    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

4    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

5    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

6

7    41.    On February 13, 2009, ▓▓▓▓ sent an e-mail to ▓▓▓▓

8    ▓▓▓▓ complaining that ▓▓▓ was trying to "poach" Oracle employees and asking him to

9    stop this practice.  In response, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

10   42.    In an email dated February 16, 2009, ▓▓▓▓ sent an email stating,

11   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

12   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

13   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

14   43.    In March 19, 2009, ▓▓▓▓ and ▓▓▓▓ communicated by email once

15   again.  Adobe and Oracle came to a mutual understanding to (1) not to directly or indirectly

16   solicit employees from any company on the "no hire" list; (2) if the candidate applied directly

17   to a company that is on the "no hire" list there was no restriction, except that each company had

18   to be told that the employee was interviewing the candidate of the other company.  ▓▓▓▓

19   admitted he was worried that the practice was illegal, but that he was willing to discuss it

20   anyway.

21   44.    In 2009, the Antitrust Division of the U.S. Department of Justice ("DOJ")

22   launched an investigation into the hiring and recruiting practices of several technology firms.

23   Wanting to avoid the DOJ's investigation, in an email dated August 17, 2009, ▓▓▓▓

24   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

25   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

26   ///

27   ///

28   ///

45.     The DOJ ultimately prosecuted a select few of the technology companies, including Apple, Google, Pixar, Intel, Adobe, and Intuit (collectively, the "Hi-Tech Companies").  In connection with its investigation, the DOJ issued a Civil Investigative Demand ("CID") to Oracle.  Oracle produced some documents pursuant to this CID.

46.     Ultimately, on September 24, 2010, the DOJ filed a complaint against certain "Hi-Tech" companies.  This "Do Not Cold Call Agreement" (non-solicitation agreements) was deemed unlawful *per se* by the DOJ, which found that those agreements were "facially anticompetitive" and violated the Sherman Act *per se*.  According to the DOJ, these agreements "eliminated significant forms of competition" and "substantially diminished competition to the detriment of the affected employees who were likely deprived of competitively important information and access to better job opportunities."  The DOJ concluded that the "Do Not Cold Call" agreements "disrupted the normal price-setting mechanisms that apply in the labor setting."  On information and belief, Oracle was among the companies investigated.

47.     On March 18, 2011, the DOJ obtained a consent decree against certain Hi-Tech companies other than Oracle.

48.     On information and belief, the DOJ sent a letter to the other technology companies it was investigating, announcing that it was closing its investigation in or about October 2014.

49.     Oracle's unlawful conduct continued after the DOJ investigation started.  Antonio Miranda was employed at Oracle.  While at Oracle, Mr. Miranda held many positions, such as Senior Manager for the Central Region, North American consulting; director of North America Consulting; Senior Director for global IT.  Mr. Miranda held that position until he left Oracle in 2011.  During his tenure as a Senior Director for global IT, Mr. Miranda, sat in on several recruiting meetings and was on calls, along with Safra Catz and Larry Ellison.  During those meetings and calls Ms. Catz carefully monitored and made certain that employees from a "do not hire" list were not recruited.

50.     As another example, a former Senior Director at Oracle ended his employment with Oracle in 2014.  At the end of his employment, that former Oracle employee asked Rivera

-9-

Partners to help place him at another technology firm.  Riviera Partners, however, informed him that it could not place this former Oracle employee because it had an agreement with Oracle not to perform job placement services for Oracle employees.  On information and belief, Oracle had agreements in place up until October 2014 and after with various recruiting companies, including Riviera Partners, not to place Oracle employees with other companies.

51.      The Secret Agreements referenced above covered all technology employees and were not necessarily limited by geography, job function, product group, or time period. The other Secret Agreements with technology companies and the companies that recruited for them, covered all Oracle employees.

52.      Oracle employees, including Plaintiff, were not apprised of any of these Secret Agreements and did not consent to this restriction on their mobility of employment.

53.      The Secret Agreements unreasonably restrained trade in violation of the Sherman Act (15 U.S.C. § 1), and the Cartwright Act (Cal. Bus. & Prof. Code §§ 16720 *et seq.*), and constituted unfair competition and unfair practices in violation of California's Unfair Competition Law, California Business & Professions Code sections 17200, *et seq.* and 16600. The Secret Agreements resulted in technology companies, including Oracle, and companies that had technology departments refusing to competitively seek contracts with one another's employees.

54.      In a lawfully competitive labor market, Oracle and each of its co-participants would have competed against each other for employees and would have hired employees according to the needs of their business and the going market rates for employee wages.  And, in such a lawfully competitive labor market, the participants of the Secret Agreements would have engaged in such employee hiring in direct competition with one another, resulting in employees accepting offers from the company which makes the most favorable offer of employment.  This competitive process helps to ensure that companies benefit by taking advantage of rivals' efforts expended soliciting, interviewing, and training skilled employees.  It also benefits the public through fostering flow of new non-proprietary information and technologies across competing industry leaders.  And, this competitive process benefits our

-10-

1    country's work force by compensating employees for the fair market value of their skills

2    knowledge, and experience.

3        55.    For these reasons, competitive hiring serves as a critical competitive role,

4    particularly in the high technology industry where companies benefit from obtaining employees

5    with advanced skills and abilities.  By restricting hiring, employee salaries at competing

6    companies is restricted and depressed, decreasing the pressure of an employee's current

7    employer to match a rival's offer and vice versa.  Restrictions on hiring also limit an

8    employee's leverage when negotiating his or her salary with his or her current employer.

9    Furthermore, when companies restrict hiring of rival companies' top tiers employees the wages

10   of those top tier employees, as well as all other employees underneath them are suppressed

11   because companies are highly unlikely to offer higher salaries to subordinates than they are to

12   managers and executives.  As a result, the effects of hiring restrictions impact all employees of

13   participating companies.

14       56.    Oracle entered into, implemented, and policed the Secret Agreements with the

15   knowledge of the overall conspiracy, and did so with the intent and effect of fixing the

16   compensation of the employees of participating companies at artificially low levels.  As

17   additional companies joined the conspiracy to control labor costs, competition among

18   participating companies for skilled labor continued to drop, and compensation and mobility of

19   the employees of participating companies was further suppressed.  These anticompetitive

20   effects were the purpose of the Secret Agreements, and Oracle and the other parties to the

21   Secret Agreements succeeded in lowering the compensation and mobility of their employees

22   below what would have prevailed in a lawful and properly functioning labor market.

23       57.    Plaintiff and each member of the Class (defined below) was harmed by

24   the Secret Agreements herein alleged.  The elimination of competition and suppression of

25   compensation and mobility had a negative cumulative effect on all Class members.  For example,

26   an individual who was a managerial employee of Oracle received faced unlawful obstacles to

27   mobility as a result of the Secret Agreements they had with all of the companies that took part in

28   the conspiracy.

## INTERSTATE COMMERCE

58.      Oracle's conduct substantially affected interstate commerce throughout the United States and caused antitrust injury throughout the United States because, among other things, Oracle has employees across state lines as well as did business across state lines.

## CLASS ALLEGATIONS

59.      Plaintiff sues on his own behalf and, under Federal Rule of Civil Procedure 23 on behalf of the following Classes:

> All natural persons who were employed by Oracle on a salaried basis in the technical, creative, and/or research and development fields in the United States from May 10, 2007 to the present. Excluded from the Class are: retail employees, corporate officers, members of the boards of directors, and senior executives of Oracle.

> All natural persons who were employed by Oracle on a salaried basis in a manager level or above position, for product, sales, or general and administrative roles in the United States at any time from May 10, 2007 to the present.  Excluded from the Class are: retail employees; corporate officers, members of the boards of directors, and senior executives of Oracle.

60.  The above-referenced classes shall be collectively known as the Plaintiff Class.

61.  The Plaintiff Class has thousands of members, as each defendant employed hundreds or thousands of class members each year.  The Plaintiff Class is so numerous that individual joinder of all members is impracticable.

62.  The Plaintiff Class is ascertainable from Oracle's employee and or payroll records.

63.  Plaintiff's claims are typical of the claims of other class members comprising the Plaintiff Class as they arise out of the same course of conduct and the same legal theories, and they challenge Oracle's conduct with respect to the Plaintiff Class as a whole.

64.  Plaintiff has retained able and experienced class action litigators as their counsel. Plaintiff has no conflicts with other class members and will fairly and adequately protect the interests of Plaintiff Class.

///

///

FIRST AMENDED ANTITRUST CLASS ACTION COMPLAINT

65. This case raises common questions of law and fact that are capable of class-wide resolution, including:

    a. whether Oracle agreed not to pursue other companies' employees in technology positions;

    b. whether Oracle's Secret Agreements were *per se* violations of the Sherman Act;

    c. whether Oracle's Secret Agreements violated the Sherman Act;

    d. whether Oracle's Secret Agreements were *per se* violations of the Cartwright Act;

    e. whether Oracle's Secret Agreements violated the Cartwright Act;

    f. whether Oracle's Secret Agreements are void as a matter of law under California Business and Professions Code section 16600;

    g. whether Oracle's Secret Agreements constituted unlawful or unfair business acts or practices in violation of California Business and Professions Code section 17220;

    h. whether Oracle fraudulently concealed its anti-competitive conduct;

    i. whether Oracle's conspiracies and associated agreements restrained trade, commerce, or competition;

    j. whether Plaintiff and the other members of the Plaintiff Class suffered injury as a result of Oracle's conspiracies and Secret Agreements;

    k. whether any such injury constitutes antitrust injury, and;

    l. the measure of damages incurred by Plaintiff and Plaintiff Class.

66. These and other common questions predominate over any questions affecting only individual class members.

67. This class action is superior to any other form of resolving this litigation. Separate actions by individual class members would be enormously inefficient and would create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Oracle and substantially impede or impair the ability of class members to pursue their claims. There will be no material difficulty in the management of this action as a class action.

///

///

///

///

1

## STATUTE OF LIMITATIONS

2

**Continuing Violation**

3      68.      Oracle's conspiracy was a continuing violation through which Oracle repeatedly

4  invaded Plaintiff and Plaintiff Class' interests by adhering to, enforcing, and reaffirming the

5  anticompetitive agreements described herein.

6      69.      As referenced above, Plaintiff was employed by Oracle from December 2008

7  through June 2009.  Up until 2015, Plaintiff continued to feel the impact of Oracle's anti-trust

8  violations.

9      70.      After he left Oracle, he applied to many technology companies, including Google,

10 Intuit, Hewlett-Packard, and Xerox, that were part of the conspiracy at some time from 2007

11 through 2015.  But, each time Plaintiff applied for a job during the four year time frame of 2010

12 through 2015, the aforementioned technology companies enforced their Secret Agreements and

13 "no-hire" agreements and refused to offer Plaintiff any open positions.

14     71.      Although well qualified, none of the technology companies that were part of the

15 conspiracy would return calls, request Plaintiff to interview, and otherwise denied Plaintiff a

16 position.  In sum, Plaintiff was unable to obtain gainful employment and thus was injured.

17     72.      Plaintiff was harmed because through continued enforcement of the Secret

18 Agreements and agreements not to hire former employees of Oracle, he was unable to obtain

19 meaningful employment of his choice.  This happened because of the ongoing enforcement of

20 anti-competitive Secret Agreements.

21     73.      Thus, as described up above, there were new and independent acts that caused new

22 and accumulating injury.  In other words, the continued enforcement of the Secret Agreements

23 were the cause of Plaintiff's inability to procure employment in one of his desired companies

24 where he was seeking employment.

25 ///

26 ///

27 ///

28 ///

**FIRST AMENDED ANTITRUST CLASS ACTION COMPLAINT**

1

**Fraudulent Concealment**

2

   **1.**  Oracle took Affirmative Acts to Misled Plaintiff.

3

     74.      Oracle has attempted to create the false impression that its decisions are

4

independent and that it was acting in accordance with the antitrust laws.

5

6

     75.      Further, the following language is also in Oracle's published employee

7

    handbook:

8

     Business Practices

9

     **Antitrust and Competition Laws**

10

     Typically, the countries in which Oracle operates have laws and
regulations that prohibit unlawful restraint of trade, usually referred to as

11

antitrust or competition laws.  These laws are designed to protect
consumers and competitors against unfair business practices and to

12

promote and protect healthy competition.  Oracle commits rigorously to
observing applicable antitrust or competition laws of all countries or

13

organizations……..

14

     Antitrust or competition laws vary from country to country but, generally,
such laws prohibit agreements or actions that reduce competition without

15

benefiting consumers.  Among those activities generally found to violate

16

antitrust or competition laws are agreements and understandings among
competitors to:

17

18

      •  Fix or control prices;
      •  Structure or orchestrate bids to direct a contract to a certain

19

         competitor or reseller (bid rigging);
      •  Boycott specified suppliers or customers;

20

      •  Divide or allocate markets tor customers; or
      •  Limit the production or sale of products or product lines for anti-

21

         competitive purposes.

22

     Agreements of the type listed above are against public policy and are
against Oracle policy.  Employees must never engage in discussions of

23

such matters with representatives of other companies…..

24

     Contracts or other arrangements that involve exclusive dealing, tie-in

25

sales, price discrimination, and other terms of sale may be unlawful under
applicable antitrust or competition laws….

26

27

     Oracle strives to ensure that its global practices comply with United States
antitrust laws.  In addition to local laws, antitrust laws of the United States

28

may apply to our international business operations and transactions….

**FIRST AMENDED ANTITRUST CLASS ACTION COMPLAINT**

76.     Additionally, all versions of Oracle's employee handbook that it published, contained a section entitled "COMPLIANCE" wherein it states:

> "We must each operate within the bounds of all laws, regulations, and internal policies applicable to Oracle's business wherever we conduct it."

77.     The above-referenced iterations in Oracle's employee handbooks, or words of substantially similar import, were published in each of Oracle's 2008-2014 employee handbooks.

78.     Larry Ellison was the author of all of these handbooks, as his name is in the opening letter to the Oracle employee.

79.     At all times, Plaintiff worked for Oracle in Colorado Springs, Colorado. Plaintiff referenced his employment handbook during his employment at Oracle – from December 2008 through June 2009 – in Colorado Springs.  In the beginning of his employment Plaintiff referenced the employee handbook to learn what was expected of him and what he could expect during his time at Oracle.  Oracle represented that it was against Oracle policy to commit any antitrust violations, like price fixing, and that Oracle assured employees "it complies with United States antitrust laws."

80.     Plaintiff also wanted to know how the compensation and commission structure worked at Oracle, and he referenced the employee handbook for that purpose as well.  After reading the handbook, Plaintiff believed he had a firm understanding of the compensation structure and the Oracle employee handbook led him to believe that Oracle complied with all laws.   Moreover, Plaintiff talked with an Oracle human resource employee who informed him, falsely, that Oracle's commission structure was competitive with other technology companies. These affirmative falsehoods led Plaintiff to believe that his salary was driven by a competitive market place and his work performance and not by a series of anti-competitive agreements.

81.     By virtue of what Oracle published in its employee handbooks that Larry Ellison authored, Oracle was thus able to conceal it was committing ongoing antitrust violations through the various Secret Agreements it had with other companies until Plaintiff ended his employment.

-16-

82.     Oracle continued to conceal its antitrust violations with its publicly filed filings with the SEC so there would be no public filing showing, or even hinting, that it might be committing antitrust violations – even when it was actively being investigated by the DOJ.

83. In Oracle's SEC 2008, filing it stated the following:

> *We may be unable to hire enough qualified employees or we may lose key employees.*   We rely on the continued service of our senior management, including our Chief Executive Officer, members of our executive team and other key employees and **the hiring of new qualified employees. In the software industry, there is substantial and continuous competition for highly skilled business, product development, technical and other personnel.** In addition, acquisitions could cause us to lose key personnel of the acquired companies or at Oracle. **We may also experience increased compensation costs that are not offset by either improved productivity or higher prices.** We may not be successful in recruiting new personnel and in retaining and motivating existing personnel. With rare exceptions, we do not have long-term employment or non-competition agreements with our employees. Members of our senior management team have left Oracle over the years for a variety of reasons, and we cannot assure you that there will not be additional departures, which may be disruptive to our operations.
>
> We continually focus on improving our cost structure by hiring personnel in countries where advanced technical expertise is available at lower costs. When we make adjustments to our workforce, we may incur expenses associated with workforce reductions that delay the benefit of a more efficient workforce structure. **We may also experience increased competition for employees in these countries as the trend toward globalization continues which may affect our employee retention efforts and/or increase our expenses in an effort to offer a competitive compensation program.**

84.     Oracle made substantially identical false public statements in its 10-K SEC filings in the years 2010, 2011, 2012, and 2013.

85.     Thus, Oracle made no public statements, and Plaintiff had no way of knowing, that Oracle was committing antitrust violations or that he had been the victim of antitrust violations that caused him harm.  In fact, he thought just the opposite because Oracle maintained its representation that there existed strong competition in the technology field, and that compensation played a role.  This, however, was not true.

86.     By virtue of the Secret Agreements, Oracle was able to reduce its compensation expenses and was able to retain employees at lower costs.

-17-

1    87.    Many times during the Class Period, Plaintiffs and other Class members

2  attempted to learn the truth about Oracle's compensation and retention practices.  Class

3  members repeatedly asked Oracle about how compensation was determined and what steps

4  Oracle was taking to retain and attract talented employees, but Oracle's misleading responses

5  that compensation was "competitive" thwarted those efforts, as illustrated above.

6    88.    Moreover, in an email dated, January 17, 2008, ██████████████████

7  ████████ sent an email to one of Oracle's recruiters stating ████████████████

8  ██████████████████████████████████ This was an effort to conceal the fact

9  that Oracle had these Secret Agreements in place.

10    89.    And ██████ sent another email shortly thereafter to one company that Oracle

11  had one of these "no-hire" agreements in place and states, ████████████████████████

12  ████████████

13    90.    In an email dated February 12, 2008, ██████████████████ sends out

14  an email to the HR department attaching a "No Hire" list, and directing them to not forward, but

15  to call if they have any questions.

16    91.    This was representative of a corporate policy decision to avoid dissemination of

17  the secret agreements and restrict the knowledge to the smallest possible group within Oracle.

18  This corporate policy of secrecy was never withdrawn or countermanded at any time between

19  the years 2008 and 2014, and continued to be in effect as Oracle's corporate policy.

20    **2.    Plaintiff Did Not Have Actual or Constructive Knowledge of the Facts Giving Rise to**

21        **His Claim.**

22    92.    The policies in the handbooks and the following SEC filings led Plaintiff to

23  believe he was free to move around in the technology field and that his compensation would

24  potentially increase in order for him to be retained.

25    93.    Moreover, several times during the Class Period, Plaintiff and other putative

26  class members attempted to learn the truth about Oracle's compensation and retention policies.

27  For instance, Plaintiff asked Oracle about his commission structure and how it worked.  Class

28  members repeatedly asked Oracle about how compensation was determined and the steps

-18-

Oracle was taking to retain and attract talented employees.  Oracle never once admitted that it had any agreements with any other company not to solicit one another's employees.  Oracle actively concealed such information as explained above.

94.     Additionally, even after the Department of Justice's investigation and the filing of the civil antitrust litigation against some of Oracle's co-conspirators, Oracle continued to take additional active measures to keep its Secret Agreements secret beyond those already described herein.  Specifically, upon receiving demands to produce documents pursuant to the Department of Justices' investigative proceedings regarding Secret Agreements in the high technology industry and any legal proceedings related thereto, Oracle refused to produce any documents without first securing agreements that the document production would not be publicly filed or disclosed, including requiring that any documents that were publicly filed or disclosed would be heavily redacted so as not to publicly reveal the substance of the Secret Agreements and the specific companies involved.  Oracle took the above-described actions between 2009 and 2013, all with the intent of preventing the disclosure of its Secret Agreements and ensuring that its employees who were affected by the Secret Agreements were not made aware of the existence of the Secret Agreements.

95.     It was not until 2013, when certain documents were unsealed in the Hi-Tech case (case number 5:11-cv-02509-LHK), and became first available to the public that Oracle's actual involvement in the anti-solicitation conspiracy was established publicly.

96.     Before May 17, 2013, at the earliest, Plaintiff did not have actual or constructive notice, and was not on inquiry notice of certain facts when he discovered he has certain claims and can seek certain relief.  The Restrictive Hiring Agreement between Oracle and Google was first publicly disclosed in a filing in this Court on May 17, 2013.  Thus, the identity of Oracle's involvement in the conspiracy remained unknown to Plaintiff until that time.

97.     Until that time, Oracle took active measures to keep the Secret Agreements secret, including, without limitation, ensuring that it had no written policy document that would be disseminated in any employee handbook as explained above.  Further, a majority of the Secret Agreements with companies were unwritten gentleman's agreements, and were carefully

FIRST AMENDED ANTITRUST CLASS ACTION COMPLAINT

communicated mostly over the phone.  Most times, these Secret Agreements were evidenced through carefully worded mails.  Also, the CEOs namely, Safra Catz, could add a company that would be subject to the Secret Agreements with an oral directive on a moment's notice.

98.     Oracle's denials still go on to this day.  On or about October 14, 2014, Oracle spokeswoman, Deborah Hellinger, stated "Oracle was deliberately excluded from all prior litigation filed in this matter because all the parties investigating the issue concluded there was absolutely no evidence that Oracle was involved."  Hence, as of October 14, 2014, Oracle was still trying to actively conceal its involvement in the conspiracy outlined above.  This statement was false and was made to mislead the class and members of the public.

99.     Moreover, Oracle tried to shield the dissemination of its Secret Agreements to the least amount of its employees as much as possible.  Their existence was confined to only the most senior executives and the most senior employees from its human resources and recruiting departments, so that the least amount of people knew of those Secret Agreements.   And, at no time from 2007 through 2015 did Oracle executives take any steps to rescind or withdraw its policy to restrict knowledge of its Secret Agreements.

100.    As a result of Oracle's fraudulent concealment of its involvement in the conspiracy, the running of any statute of limitations has been tolled with respect to the claims that Plaintiff and Plaintiff Class have as a result of the anticompetitive and unlawful conduct alleged herein.

**FIRST COUNT**

**(Violation of the Sherman Act, *15 U.S.C. § 1*)**

101.    Plaintiff incorporates by reference all the allegations in the above paragraphs as if fully set forth herein.

102.    15 U.S.C. section 1 provides, in part, that every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

///

///

103.     Oracle, by and through its officers, directors, employees, agents, or other representatives, has entered into an unlawful agreement, combination, and conspiracy in restraint of trade, in violation of 15 U.S.C. section 1.  Specifically, Defendant agreed in advance that Google and Oracle would not pursue one another's managerial employees.  All of the foregoing directly and negatively affected and suppressed the wages of managerial employees at Oracle. Oracle and Google conspired and agreed to restrict competition for services provided by Plaintiff and members Plaintiff Class through Restrictive Hiring Agreements and agreements to fix the wage and salary ranges for said class members, all with the purpose and effect of suppressing class members' compensation and restraining competition in the market for services of class members.

104.     Oracle's conduct injured and damaged Plaintiff and members of the Plaintiff Class and the Oracle Class by suppressing compensation to levels lower than the members otherwise would have received in the absence of the Restrictive Hiring Agreements, all in an amount to be proven at trial.

105.     Oracle's Secret Agreements are either *per se* violations of the Sherman Act or violative of it.

106.     The acts done by each defendant as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Oracle's affairs.

107.     As a result of the above violations, Plaintiff and Plaintiff Class have been damaged in an amount according to proof.  Accordingly, Plaintiff and Plaintiff Class seeks three times their damages caused by Oracle's violations of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendant from ever again entering into similar agreements in violation of the Sherman Act.

///

///

///

FIRST AMENDED ANTITRUST CLASS ACTION COMPLAINT

## SECOND COUNT

### (Violation of the Cartwright Act, *Cal. Bus. & Prof. Code §§ 16720, et seq.*)

108.    Plaintiff incorporates by reference all the allegations in the above paragraphs as if fully set forth herein.

109.    Except as expressly provided in California Business and Professions Code sections 16720 *et seq.*, every trust is unlawful, against public policy, and void.  A trust is a combination of capital, skill, or acts by two or more persons for any of the following purposes:

(a) To create or carry out restrictions in trade or commerce.

(b) To limit or reduce the production, or increase the price of merchandise or of any commodity.

(c) To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity.

(d) To fix at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, barter, use or consumption in this State.

110.    Oracle, by and through its officers, directors, employees, agents or other representatives, has entered into an unlawful agreement, combination, and conspiracy in restraint of trade, in violation of California Business and Professions Code section 16720.

111.    Oracle conspired with Google, Intuit, Adobe, and the other technology companies identified above and entered into an unlawful trust agreement in restraint of trade and commerce by, among other things, restricting and limiting, to a substantial degree, competition among these defendants' skilled labor, and fixing the wages and salary ranges for said class members, all with the purpose and effect of suppressing class members' compensation and restraining competition in the market for services of class members.  As of 2007, Oracle involved itself with this conspiracy.

///

///

///

112.     As a direct and proximate result of Oracle's conduct members of the Plaintiff Class were also injured by incurring suppressed compensation to levels lower than the members otherwise would have incurred in the absence of Oracle's unlawful trust, all in an amount to be proven at trial.

113.     Oracle, Plaintiff, and other class members are "persons" within the meaning of the Cartwright Act as defined in California Business and Professions Code section 16702.

114.     Oracle's agreements are *per se* violations of the Cartwright Act, and their conduct violates the Cartwright Act.

115.     As a result of the above violations, Plaintiff and Plaintiff Class have been damaged in an amount according to proof.

## <u>THIRD COUNT</u>

### (Unfair Competition, *Cal. Bus. & Prof. Code §§ 17200 et seq.*)

116.     Plaintiff incorporates by reference all the allegations in the above paragraphs as if fully set forth herein.

117.     Under California Business and Professions Code sections 17200, *et seq.*, any person who engages, has engaged, or proposes to engage in unfair competition—which includes any fraudulent or unlawful business act or practice—may be enjoined in any court of competent jurisdiction, may be held liable for restoring to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition, and may be held liable for civil penalties.

118.     Oracle is a "person" under the meaning of sections 17200, *et seq.*

119.     Oracle entered into an illegal Secret Agreements to suppress wages of their respective workforce by restricting the ability of its managerial employees from attaining employment with the other technology companies.

120.     Oracle's acts were unfair, unlawful, and or unconscionable, both in their own right and because they violated the Sherman Act and the Cartwright Act.

121.     Oracle's conduct injured Plaintiff and other members of Plaintiff Class suppressing the value of managerial employees' services and thus suppressing their wages.

1   Plaintiff and other class members are therefore persons who have suffered injury in fact and lost

2   money or property as a result of the unfair competition under California Business and

3   Professions Code section 17204.

4        122.      Under California Business and Professions Code section 17203, disgorgement of

5   Oracle's unlawful gains is necessary to prevent the use or employment of Oracle's unfair

6   practices and restitution to Plaintiff and other class members is necessary to restore to them the

7   money or property unfairly withheld from them.

8        123.      As a result of the above unlawful acts, Plaintiff and Plaintiff Class have been

9   damaged in an amount according to proof.

10

11                                    **FOURTH COUNT**

12                    (Violation of *Cal. Bus. & Prof. Code §§ 16600 et seq.*)

13       124.      Plaintiff incorporates by reference all the allegations in the above paragraphs as if

14   fully set forth herein.

15       125.      Under California Business and Professions Code section 16600, *et seq.*, except as

16   expressly provided for by section 16600, et seq., every contract by which anyone is restrained

17   from engaging in a lawful profession, trade, or business of any kind is to that extent void.

18       126.      Oracle entered into, implemented, and enforced express agreements that are

19   unlawful and void under Section 16600.

20       127.      Oracle's agreements and conspiracy have included concerted action and

21   undertakings among the Defendant and others with the purpose and effect of: (a) reducing open

22   competition among Defendant and other companies for skilled labor; (b) reducing employee

23   mobility; (c) reducing or eliminating opportunities for employees to pursue lawful employment

24   of their choice; and (d) limiting employee professional betterment.

25       128.      Oracle's agreements and conspiracy are contrary to California's settled legislative

26   policy in favor of open competition and employee mobility, and are therefore void and unlawful.

27       129.      Oracle's agreements and conspiracy were not intended to protect and were not

28   limited to protecting any legitimate proprietary interest of Defendant.

130.     Oracle's agreements and conspiracy do not fall within any statutory exception to Section 16600, *et seq.*

131.     The acts done by Oracle and each of the parties to the Secret Agreements as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each defendant's affairs.

132.     Accordingly, Plaintiff and members of Plaintiff Class seek a judicial declaration that Defendant's agreements and conspiracy are void as a matter of law under Section 16600, and a permanent injunction enjoining Oracle from ever again entering into similar agreements in violation of Section 16600.

## **PRAYER FOR RELIEF**

Plaintiff, on behalf of himself individually and on behalf of Plaintiff Classes prays for relief and judgment against Defendant and any later named defendant, jointly and severally as follows:

1.  that the Court determine that this action may be maintained as a class action;

2.  Appointment of Plaintiff as Class Representative and his counsel of record as Class Counsel;

3.  Pre-judgment and post-judgment interest as provided by law or allowed in equity;

4.  An incentive award to compensate Plaintiff for his effort in pursuit of this litigation;

5.  For nominal damages;

6.  For compensatory damages;

7.  For injunction against Defendant, prohibiting any further acts in continuance or perpetuation of any Restrictive Hiring Agreements;

8.  For restitution of all monies due to Plaintiff, and the Plaintiff Class, and disgorged profits from the unlawful business practices of Defendant;

9.  For costs of suit and expenses incurred herein;

10. For reasonable attorneys' fees;

1

2

           11. For treble damages; and

           12. For all such other and further relief the Court may deem just and proper.

3

4

## JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL

5

        Under Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury

6

on all issues so triable.

7

8

Dated:  May 22, 2015                    **HOGUE & BELONG**

9

10

11

                        */s/ Jeffrey L. Hogue*

                        JEFFREY L. HOGUE

                        TYLER J. BELONG

12

                        BRYCE A. DODDS

                        Attorneys for Plaintiff and on behalf of those

13

                        similarly situated

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28