LATHAM & WATKINS LLP
   Daniel M. Wall (Bar No. 102580)
   Sarah M. Ray (Bar No. 229670)
   505 Montgomery Street, Suite 2000
   San Francisco, California 94111-6538
   Telephone: (415) 391-0600
   Facsimile:  (415) 395-8095
   Email: dan.wall@lw.com
   Email: sarah.ray@lw.com

   Elyse M. Greenwald (Bar No. 268050)
   John Hancock Tower, 27th Floor
   200 Clarendon Street
   Boston, Massachusetts 02116
   Telephone: (617) 948-6000
   Facsimile:  (617) 948-6001
   Email: elyse.greenwald@lw.com

ORACLE CORPORATION
   Dorian Daley (Bar No. 129049)
   Deborah K. Miller (Bar No. 95527)
   James C. Maroulis (Bar No. 208316)
   500 Oracle Parkway
   Redwood Shores, California 94065
   Telephone: (650) 506-5200
   Facsimile:  (650) 506-7114
   Email: dorian.daley@oracle.com
   Email: deborah.miller@oracle.com
   Email: jim.maroulis@oracle.com

Attorneys for Defendant
ORACLE CORPORATION

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| GREG GARRISON, DEBORAH VAN VORST, and SASTRY HARI, individually and on behalf of all others similarly situated; <br><br> Plaintiffs, <br><br> v. <br><br> ORACLE CORPORATION, a Delaware corporation; <br><br> Defendant. | CASE NO. 5:14-cv-04592-LHK <br><br> **DEFENDANT ORACLE CORPORATION'S NOTICE AND MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED ANTITRUST CLASS ACTION COMPLAINT** <br><br> Date:  October 15, 2015 <br> Time:  1:30 p.m. <br> Place:  Courtroom 8, 4th Floor <br> Judge: Honorable Lucy H. Koh |

1

## NOTICE OF MOTION AND MOTION

2    TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3    PLEASE TAKE NOTICE THAT on October 15, 2015, at 1:30 p.m., or as soon

4    thereafter as the matter may be heard, in the courtroom of the Honorable Lucy H. Koh of the

5    above-captioned United States District Court, located at 280 South 1st Street, San Jose,

6    California, defendant Oracle Corporation ("Oracle") will and does hereby move to dismiss

7    plaintiffs Greg Garrison, Deborah Van Vorst, and Sastry Hari's Second Amended Antitrust

8    Class Action Complaint with prejudice pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a

9    claim.

10    This motion is based on this Notice of Motion and Motion, the Memorandum of Points

11    and Authorities, Oracle's Request for Judicial Notice and the exhibits attached thereto, the

12    records on file in this case, the arguments of counsel, and any other matter that the Court may

13    properly consider, or that may be presented to the Court at the hearing.

14    Oracle respectfully requests that the Court grant its motion and dismiss plaintiffs' claims

15    with prejudice.

16    Dated:  June 25, 2015                        Respectfully submitted,

17

18                                    By /s/Sarah M. Ray
                                         Sarah M. Ray

19                                    LATHAM & WATKINS LLP
                                         Daniel M. Wall (Bar No. 102580)
20                                       Sarah M. Ray (Bar No. 229670)
                                         505 Montgomery Street, Suite 2000
21                                       San Francisco, California 94111-6538
                                         Telephone: (415) 391-0600
22                                       Email: dan.wall@lw.com
                                         Email: sarah.ray@lw.com

23
                                         Elyse M. Greenwald (Bar No. 268050)
24                                       John Hancock Tower, 27th Floor
                                         200 Clarendon Street
25                                       Boston, Massachusetts 02116
                                         Telephone: (617) 948-6000
26                                       Email: elyse.greenwald@lw.com

27                                    ORACLE CORPORATION
                                         Dorian Daley (Bar No. 129049)
28                                       Deborah K. Miller (Bar No. 95527)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

James C. Maroulis (Bar No. 208316)
500 Oracle Parkway
Redwood Shores, California 94065
Telephone: (650) 506-5200
Email: dorian.daley@oracle.com
Email: deborah.miller@oracle.com
Email: jim.maroulis@oracle.com

Attorneys for Defendant
ORACLE CORPORATION

# TABLE OF CONTENTS

**Page**

I.    Introduction ................................................................................................................ 1

II.   Statement Of Issues To Be Decided ........................................................................... 3

III.  Procedural Background ................................................................................................ 3

IV.   The Second Amended Complaint ................................................................................ 3

    A.   The DOJ Consent Decree With The *High-Tech* Plaintiffs........................................ 3

    B.   Plaintiffs' New "Secret" Conspiracy ...................................................................... 4

V.    Argument ...................................................................................................................... 7

    A.   Legal Standard ........................................................................................................ 7

    B.   Plaintiffs' Claims Remain Time Barred And Should Be Dismissed ..................... 7

        1.   Plaintiffs Have Not Adequately Pled A Continuing Violation ................... 8

        2.   Plaintiffs Have Not Adequately Pled Fraudulent Concealment ............... 11

            a.   Plaintiffs Have Not Alleged Any Affirmative Misconduct ........... 12

                (1)   Oracle Had No Duty To Disclose Its Allegedly Illicit Agreements To Plaintiffs...................... 12

                (2)   Plaintiffs' Allegations Confirm That Oracle's Alleged Agreements And No-Hire List Were Widely Disclosed ........................................... 13

                (3)   Plaintiffs Have Alleged No Pretextual Or Misleading Statements ................................................... 15

    C.   Plaintiffs Have Not Pled A Section 1 Claim ........................................................ 18

        1.   Plaintiffs Again Have Alleged No Plausible Agreement with Google...................................................................................................... 18

        2.   Plaintiffs' New "Conspiracy" Is Also Not Plausible ............................... 19

    D.   Plaintiffs Also Fail To State A UCL Claim .......................................................... 23

    E.   Plaintiffs Lack Article III Standing To Seek Injunctive Or Declaratory Relief ............................................................................................... 24

VI.   Conclusion .................................................................................................................. 25

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

### CASES

4

*In re Animation Workers Antitrust Litig.,*
5
    2015 WL 1522368 (N.D. Cal. Apr. 3, 2015) ................................................... *passim*

6
*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..........................................................................................7
7

8
*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ...........................................................................7, 18, 25

9
*In re Cathode Ray Antitrust Litig.,*
10
    738 F. Supp. 2d 1011 (N.D. Cal. 2010) ...........................................................16

11
*Clark v. City of Lakewood,*
    259 F.3d 996 (9th Cir. 2001) ...........................................................................24
12

13
*Credit Bureau Servs.v. Experian Info. Solutions, Inc.,*
    2013 U.S. Dist. LEXIS 94313 (C.D. Cal. June 28, 2013) ......................................22

14
*David Orgell, Inc. v. Geary's Stores, Inc.,*
15
    640 F.2d 936 (9th Cir. 1981) ...........................................................................11

16
*Garrison v. Oracle Corp.,*
    2015 WL 1849517 (N.D. Cal. Apr. 22, 2015) ............................................... *passim*
17

18
*Gest v. Bradbury,*
    443 F.3d 1177 (9th Cir. 2006) .........................................................................24

19
*In re Gilead Scis. Sec. Litig.,*
20
    536 F.3d 1049 (9th Cir. 2008) ...........................................................................7

21
*Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.,*
    2010 U.S. Dist. LEXIS 120447 (W.D. Wash. Oct. 27, 2010) .................................10
22

23
*Haines v. VeriMed Healthcare Network, LLC,*
    613 F. Supp. 2d 1133 (E.D. Mo. 2009) ...........................................................23

24
*Hexcel Corp. v. Ineos Polymers, Inc.,*
25
    681 F.3d 1055 (9th Cir. 2012) .........................................................................14

26
*In re High-Tech Empl. Antitrust Litig.,*
    2014 U.S. Dist. LEXIS 110064 (N.D. Cal. Aug. 8, 2014)...................................20
27

28
*In re High-Tech Empl. Antitrust Litig.,*
    856 F. Supp. 2d 1103 (N.D. Cal. 2012) ....................................................... *passim*

*Kneivel v. ESPN,*
   393 F.3d 1068 (9th Cir. 2005) ...............................................................................9

*Korea Supply Co. v Lockheed Martin Corp.,*
   29 Cal. 4th 1134 (2003) .....................................................................................24

*In re Lithium Ion Batteries Antitrust Litig.,*
   2014 WL 309192 (N.D. Cal. Jan. 21, 2014) ..............................................15, 17

*Molinari v. Consol Energy Inc.,*
   2012 WL 4928489 (W.D. Pa. Oct. 16, 2012) .....................................................22

*O'Shea v. Littleton,*
   414 U.S. 488 (1974)............................................................................................24

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.,*
   939 F. Supp. 2d 1002 (N.D. Cal. 2013) .............................................................23

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v.*
   *Hewlett-Packard Co.,*
   52 F. Supp. 3d 961 (N.D. Cal. 2014) ................................................................16

*Rick-Mik Enters. Inc. v. Equilon Enters. LLC,*
   532 F.3d 963 (9th Cir. 2008) .............................................................................18

*In re Scrap Metal Antitrust Litig.,*
   2006 U.S. Dist. LEXIS 75873 (N.D. Ohio Sept. 30, 2006)..................................7

*Slack v. Int'l Union of Operating Eng'rs,*
   2014 U.S. Dist. LEXIS 115568 (N.D. Cal. Aug, 19, 2014)................................25

*In re TFT-LCD Antitrust Litig.,*
   586 F. Supp. 2d 1109 (N.D. Cal. 2008) .............................................................15

*Ulrich v. Moody's Corp.,*
   2014 U.S. Dist. LEXIS 145898 (S.D.N.Y. Mar. 31, 2014) ................................22

*Volk v. D.A. Davidson & Co.,*
   816 F.2d 1406 (9th Cir. 1987) ...........................................................................12

*Wal-Mart Stores, Inc. v. Dukes,*
   131 S. Ct. 2541 (2011)........................................................................................25

*Walsh v. Nev. Dep't of Human Res.,*
   471 F.3d 1033 (9th Cir. 2006) ...........................................................................25

*William O. Gilley Enters. Inc., v. Atl. Richfield Co.,*
   588 F.3d 659 (9th Cir. 2009) .............................................................................25

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

DEF.'S MOT. TO DISMISS SECOND AM. COMPL.
5:14-cv-04592-LHK

*Zanze v. Snelling Servs.*, LLC,
   412 F. App'x 994 (9th Cir. 2011) ........................................................................25

**STATUTES**

15 U.S.C. § 16(i) ...............................................................................................7

Cal. Bus. & Prof Code § 16600 ........................................................7, 23, 24

**RULES**

Fed. R. Civ. Proc. Rule 9(b)........................................................11, 15, 17, 18

Fed. R. Civ. Proc. Rule 12(b)(6)...............................................................2, 7

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3        Plaintiffs filed this lawsuit against Oracle on October 14, 2014, alleging, based on a

4   single internal Google document produced in the *In re High-Tech Employee Antitrust Litigation*

5   ("*High-Tech*"), that Oracle and Google entered into an agreement "not to pursue" each other's

6   manager level and above employees.  ECF No. 1.  On April 22, 2015, the Court held that

7   plaintiffs' complaint was "largely bereft of *any* dates or details with regards to Oracle's specific

8   conduct" and plaintiffs' claims were barred by the four year statute of limitations.  *Garrison v.*

9   *Oracle Corp.*, 2015 WL 1849517, at *7, 9 (N.D. Cal. Apr. 22, 2015)

10       Plaintiffs' Second Amended Antitrust Class Action Complaint ("SAC") fares no better

11   and plaintiffs' claims remain time barred.  Plaintiffs' allegations regarding Oracle's allegedly

12   illicit conduct all take place outside of the limitations period.  Plaintiffs have alleged no "new or

13   independent act" by Oracle within the limitations period, *i.e.*, after October 14, 2010, and thus

14   have not pled a continuing violation.  Nor have plaintiffs alleged any "affirmative misconduct"

15   by Oracle to conceal its allegedly unlawful behavior.  Plaintiffs therefore have failed to allege a

16   plausible tolling theory.

17       But not only do plaintiffs fail to allege a *continuing* violation, they fail to allege an

18   *original* violation.  Even after reviewing the documents Oracle produced to the Department of

19   Justice ("DOJ") during its investigation of high tech company hiring practices, plaintiffs allege

20   no new details regarding Oracle's purported agreement with Google—the impetus for this entire

21   lawsuit.  The SAC describes no conduct by Oracle relating to Google or any communications

22   between Oracle and Google.  The sole new allegation confirms that Google made a unilateral

23   business decision not to hire Oracle's employees, without Oracle's knowledge or complicity.

24       Recognizing that their original allegations have no merit, plaintiffs have changed course,

25   and now allege a vague conspiracy that bears no resemblance to their original complaint.  The

26   SAC mischaracterizes documents that Oracle produced to the DOJ, which show that in

27   appropriate circumstances, Oracle includes non-solicitation clauses in its contracts ancillary to

28   legitimate business collaborations and catalogues these contractual obligations in a spreadsheet

1   referred to as the "no-hire list."  From these practices, plaintiffs seek to infer a new conspiracy

2   among Oracle and "a plethora" of "other technology companies," the "technology departments

3   of non-technology based companies," and unnamed "recruiting companies."  SAC ¶¶ 2-4, 7, 9.

4          The DOJ, however, reviewed the same documents that plaintiffs selectively excerpt, and

5   *closed its investigation of Oracle* without taking any action.  The DOJ understood that Oracle's

6   narrowly drawn contractual non-solicitation clauses do not imply any antitrust conspiracy.

7   Indeed, the DOJ delineated in its consent decree with the *High-Tech* defendants—the parties that

8   the DOJ *did* bring actions against—the proper uses of such non-solicitation provisions, *e.g.,*

9   when contained in agreements ancillary to a legitimate business collaboration and limited by job

10  function (*e.g.*, consultants engaged on a particular project), geography (*e.g.*, employees in a

11  particular geographic area), and/or time period (*e.g.*, six months after the end of a project).  *See*

12  Oracle's Request for Judicial Notice ("RJN"), Ex. 12 ¶ V.A.[1]

13         Plaintiffs have not pled anything else.  The documents Oracle produced to the DOJ upon

14  which plaintiffs now rely show that far from engaging in a "secret" scheme, Oracle openly

15  tracked all of its non-solicitation contractual provisions in its "no-hire list."  This list was

16  distributed broadly to Oracle's recruiters and managers, including through its posting on an

17  internal Oracle website, so that they could comply with Oracle's permissible contractual

18  arrangements when recruiting, and the list was regularly updated and reviewed by individuals in

19  Oracle's human resources department.  Not only is this practice lawful, but the DOJ *required*

20  that the *High-Tech* defendants track and maintain records of any non-solicitation arrangements in

21  essentially the same manner.  The facts plaintiffs allege thus only confirm that Oracle's hiring

22  and recruiting practices were, and are, lawful.

23         In sum, the Court need not reach the merits of plaintiffs' claims because they are time

24  barred.  But even if they were not, plaintiffs' claims are deficient because the types of

25  agreements plaintiffs allege Oracle entered into do not violate the antitrust laws, as the DOJ has

26  already determined.

27

28  [1]     For the reasons explained in Oracle's concurrently filed Request for Judicial Notice,
    Oracle requests that the Court consider the DOJ's consent decree, as well as other documents
    that are a matter of public record and/or incorporated by reference in plaintiffs' complaint.

## II.     STATEMENT OF ISSUES TO BE DECIDED

Whether plaintiffs' SAC should be dismissed with prejudice under Rule 12(b)(6) because their claims are time barred and do not state a claim upon which relief may be granted.

## III.    PROCEDURAL BACKGROUND

On April 22, 2015, the Court dismissed plaintiff Greg Garrison's ("Garrison") complaint. *Garrison*, 2015 WL 1849517, at *9. The Court warned that failure to "cure the deficiencies" identified would result in dismissal of Garrison's claims with prejudice. *Id*. Garrison filed a First Amended Complaint on May 22, 2015. ECF No. 98. On June 2, 2015, he requested that Oracle stipulate to allow him to further amend his complaint, and Oracle agreed. ECF No. 104. On June 5, 2015, Garrison filed his SAC, alleging new facts and claims on behalf of two additional named plaintiffs, Deborah Van Vorst ("Van Vorst") and Sastry Hari ("Hari"). ECF No. 105. The SAC is plaintiffs' third attempt to state a claim against Oracle.

## IV.     THE SECOND AMENDED COMPLAINT

### A.      The DOJ Consent Decree With The *High-Tech* Plaintiffs

Plaintiffs again attempt to link their allegations of a "conspiracy" to the intertwined, executive-to-executive agreements challenged by the DOJ and at issue in the *High-Tech* litigation. *See* SAC ¶¶ 10, 50-53. While the DOJ alleged that the "Do Not Cold Call" agreements at issue were *per se* unlawful, *see id.* ¶ 51, the DOJ made clear that not all non-solicitation agreements are unlawful or anticompetitive. In a separate section of its consent decree entered into with the *High-Tech* defendants entitled "Conduct Not Prohibited," the DOJ set forth a broad range of circumstances under which a *High-Tech* defendant or "any other person" could lawfully enter into a "no direct solicitation provision," including where:

1. contained within existing and future employment or severance agreements with the Defendant's employees;

2. reasonably necessary for mergers or acquisitions, consummated or unconsummated, investments, or divestitures, including due diligence related thereto;

3. reasonably necessary for contracts with consultants or recipients of consulting services, auditors, outsourcing vendors, recruiting agencies or providers of temporary employees or contract workers;

4. reasonably necessary for the settlement or compromise of legal disputes; or

5. reasonably necessary for (i) contracts with resellers or OEMs; (ii) contracts with

providers or recipients of services other than those enumerated in paragraphs [1-4] above; or (iii) the function of a legitimate collaboration agreement, such as joint development, technology integration, joint ventures, joint projects (including teaming agreements), and the shared use of facilities.

RJN Ex. 12 ¶ V.A.[2]  In addition, the consent decree requires that the *High-Tech* defendants maintain and track their permissible non-solicitation arrangements.  *See id.* ¶¶ V.B., V.C, VI.A.6.

## B.  Plaintiffs' New "Secret" Conspiracy

The named plaintiffs are former Oracle employees.  SAC ¶¶ 16, 18, 20.  Garrison worked for Oracle from December 2008 to January 2009 in Colorado as a Senior Account Manager.  *Id.* ¶¶ 16-17.  Van Vorst also worked for Oracle in Colorado from "approximately 2009 to August 2012" as a Sales Operations Manager and Business Analyst, *id.* ¶¶ 18-19, 89, and Hari worked for Oracle as a Senior Manager of Quality Assurance from "the middle of 2012" to November 2013 in the "Bay Area."  *Id.* ¶¶ 20-21, 89.  None of the named plaintiffs allege they were loaned out to Oracle's customers as consultants.

Plaintiffs allege a "secret" "conspiracy" among Oracle, "other technology companies," "the technology departments of non-technology based companies," and unnamed "recruiting companies" to "suppress employee compensation, and to impose unlawful restrictions on employee mobility."[3]  *Id.* ¶¶ 2-4, 9.  While plaintiffs allege that Oracle's conduct was part of the same "overarching conspiracy" alleged in the DOJ's 2010 complaint against the *High-Tech* defendants, *id.* ¶¶ 10, 51, plaintiffs support this conclusory assertion with factual detail suggesting only that Oracle had a unilateral policy of not hiring from its business partners, *id.* ¶¶ 41, 43, 44, 99, and that its service agreements with its business partners and customers

---

[2]    The DOJ again recognized that the exact same types of non-solicitation clauses are lawful in its consent decree entered into with eBay in September 2014.  *See* RJN Ex. 14 ¶ V.A.

[3]    Throughout the SAC, plaintiffs imply that Oracle "fixed" the wages of its employees, yet there are no actual allegations of any "wage fixing" conduct.  *See, e.g.*, SAC ¶ 61 ("Oracle entered into . . . the Secret Agreements . . . with the intent and effect of *fixing the compensation*" of its employees "at artificially low levels") (emphasis added); *see also id.* ¶¶ 2, 9, 113, 121.  Rather, plaintiffs have simply copied these allegations from the complaint in the *In re Animation Workers Antitrust Litigation*, 5:14-cv-04062-LHK, which alleges that defendants exchanged competitively sensitive wage information in order to "fix narrow compensation ranges. . . ." RJN Ex. 18 ¶¶ 9-11, 42, 86-115.  Plaintiffs, however, do not allege that Oracle exchanged any competitively sensitive wage information with other companies nor any other conduct that supports their allegation of "wage fixing."

1  sometimes included narrowly tailored non-solicitation clauses limited to the employees directly

2  involved in the provision of services.  *See id.* ¶¶ 29, 36, 49; RJN Exs. 5, 9.  Plaintiffs allege that

3  Oracle orchestrated this "conspiracy" by maintaining and updating a "no-hire" list to track the

4  companies with whom it had allegedly agreed not to solicit from, though plaintiffs maintain that

5  not all of Oracle's alleged agreements were included on this list.  *See id.* ¶¶ 26-27, 31, 49.

6          As an example of Oracle's alleged misconduct, plaintiffs repeat their allegation that in

7  May 2007, Oracle entered into an agreement with Google "not to pursue" each other's "manager

8  level and above" employees in product, sales, or general and administrative roles.  *Id.* ¶ 32.  Yet,

9  as they did in their prior complaint, plaintiffs fail to plead any details about this purported

10  "agreement" or Oracle's conduct.  *See id.*

11          Plaintiffs also allege that Intuit was a "permanent fixture" on Oracle's no-hire list and

12  that Oracle had "an anti-solicitation and no-hire agreement" with Intuit.  *Id.* ¶¶ 27, 29.  However,

13  the December 29, 2009 no-hire list, which plaintiffs reference, confirms that any non-solicitation

14  arrangement with Intuit was limited to "the West Regional [Division] of Oracle Consulting," and

15  provided only that "[n]either party [would] solicit for employment or retention  as an

16  independent contractor any employee or former employee of the other who provided services"

17  pursuant to the parties' agreement for services.  RJN Ex. 9.

18          Plaintiffs further allege that Oracle entered into a "secret" agreement and added

19  CoreTech to its no-hire list in December 2009.  SAC ¶ 49.  Plaintiffs do not allege the terms of

20  any agreement with CoreTech but the December 29, 2009 no-hire list describes only a narrow

21  contractual provision whereby Oracle and CoreTech agreed only that "[d]uring the term of any

22  Statement of Work . . . and for a period of six (6) months thereafter, neither [CoreTech] nor

23  Oracle North American Consulting . . . [would] solicit and hire any employee of the other who

24  provided Services pursuant to such Statement of Work without the prior written consent of the

25  other party."  RJN Ex. 9.

26          Plaintiffs additionally allege that Oracle either entered into an agreement with IBM "not

27  [to] solicit[] each other's consultants,"  SAC ¶ 30, or had a unilateral "policy" of not soliciting

28  from IBM and its other consulting partners, including Deloitte.  *Id.* ¶ 41.  While plaintiffs allege

that Oracle entered into an agreement with Adobe not to solicit "employees from any company on the no-hire list," *id.* ¶ 47, the emails plaintiffs quote to allege such an agreement make no mention of Oracle's no-hire list, and only discuss Adobe's solicitation—and hiring of—Oracle employees in "EMEA," an acronym for Europe, the Middle East, and Africa.  RJN Exs. 7, 8.  All of the conduct described in these allegations occurred in or before March 2009.  SAC ¶¶ 45-47.

To excuse their delay in bringing suit more than eight years after the formation of the first alleged "secret" agreement, plaintiffs assert that "Oracle made no public statements" regarding its allegedly anticompetitive conduct, SAC ¶ 95, and misrepresented in its employee handbook and SEC filings that it complies with the antitrust laws and that its compensation is competitive. *Id.* ¶¶ 84-96.  Plaintiffs allege on the one hand, that Oracle's human resources employees openly enforced and told other Oracle employees about Oracle's allegedly unlawful hiring policies and agreements and freely disseminated the "no-hire" list, *see id.* ¶¶ 31, 98, 99, but on the other, that Oracle endeavored to "restrict knowledge [of its alleged agreements and policies] to the smallest possible group" of the "most senior executives." *Id.* ¶¶ 101, 109.  Despite their allegations of widespread internal dissemination of the "no-hire" list, plaintiffs contend they did not have "actual or constructive" knowledge of "Oracle's involvement in the conspiracy" until May 17, 2013, when the so-called "Restrictive Hiring Agreement between Oracle and Google" was filed publicly in the *High-Tech* case.  *Id.* ¶ 106.[4]

Plaintiffs seek to bring their claims on behalf of two putative classes, each numbering in the "thousands," defined as all salaried employees who worked at Oracle in the U.S. between May 10, 2007 and the present in either (1) "technical, creative, and/or research and development fields," or (2) "manager level or above positions, for product, sales, or general and administrative roles."  SAC ¶¶ 64, 66.  Retail employees, corporate officers, members of the board of directors, and senior executives are excluded from the proposed class definitions.[5]  *Id.* ¶ 64.

---

[4]     Having now largely abandoned their initial theory that Google and Oracle entered into an unlawful agreement, it is curious that plaintiffs still assert that the 2013 publication of the Google document was the first time they could have learned of this entirely different alleged conspiracy.

[5]     None of the agreements alleged makes any reference to "technical, creative, and/or research" employees, and plaintiffs simply lifted this class definition verbatim from the *High-Tech* plaintiffs' complaint without considering the applicability of the class definition to their

## V.       ARGUMENT

### A.       Legal Standard

Plaintiffs' complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it lacks sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility" only where the "pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Twombly*, 550 U.S. at 545, 555. The Court need not accept as true "allegations that contradict matters properly subject to judicial notice," or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation omitted).

### B.       Plaintiffs' Claims Remain Time Barred And Should Be Dismissed

Plaintiffs' claims under the Sherman Act, Cartwright Act, California's Unfair Competition Law ("UCL"), and California Business and Professions Code § 16600 ("Section 16600") are all subject to a four year statute of limitations. *Garrison*, 2015 WL 1849517, at *6. While plaintiffs provide no precise date in the SAC as to when Oracle's allegedly unlawful conduct began, the last specific instance of purported misconduct is March 2009, when Oracle allegedly "came to a mutual understanding" with Adobe. SAC ¶ 47. Even giving plaintiffs the benefit of this last alleged act, the statute of limitations for plaintiffs' claims expired in March 2013, absent allegations of a continuing violation or that Oracle fraudulently concealed its alleged misconduct.[6] The SAC, however, does not cure the deficiencies identified by the Court, and again, plaintiffs have failed to adequately allege a plausible tolling theory.

---

claims. *In re High-Tech Empl. Antitrust Litig.* ("*High-Tech*"), 856 F. Supp. 2d 1103, 1116 (N.D. Cal. 2012). As plaintiffs know, Oracle, a provider of business software systems, does not have "retail" employees.

[6]       The DOJ's investigation of Oracle provides no basis for tolling the statute of limitations for plaintiffs' claims. *See* 15 U.S.C. § 16(i) (tolling statute of limitations "[w]henever any civil or criminal *proceeding is instituted* by the United States") (emphasis added); *see also In re Scrap Metal Antitrust Litig.*, 2006 U.S. Dist. LEXIS 75873, at *83 (N.D. Ohio Sept. 30, 2006) ("more than a government investigation is needed to activate § 16(i)"), *aff'd on other grounds*, 527 F.3d 517 (6th Cir. 2008). Accordingly, the fact that the DOJ did not formally close its investigation of Oracle until October 2014, *see* SAC ¶ 53, is of no import.

1 **1.      Plaintiffs Have Not Adequately Pled A Continuing Violation**

2          The Court made clear in dismissing Garrison's complaint that to invoke the continuing

3 violation doctrine, plaintiffs "must allege more than a continuing violation; [they] must also

4 allege an overt act" in order to restart the limitations period. *Garrison*, 2015 WL 1849517, at *7.

5 The Court further explained that a defendant's conduct only constitutes an "overt act" if it is "(1)

6 a new and independent act that is not merely a reaffirmation of a previous act; and (2) inflicts

7 new and accumulating injury on the plaintiff." *Id.* (internal quotations omitted).  Despite this

8 guidance, plaintiffs fail to make the necessary showing.

9          Plaintiffs repeat their allegation that "Oracle's conspiracy was a continuing violation"

10 that "repeatedly invaded Plaintiffs' and Plaintiff Class' interests by adhering to, enforcing, and

11 reaffirming the [alleged] anticompetitive agreements," SAC ¶ 73, a "bald assertion" that the

12 Court already found "woefully lacking." *Garrison*, 2015 WL 1849517, at *7.  And instead of

13 describing any "new or independent" action taken by Oracle, plaintiffs allege only that Oracle

14 "continued [to] enforce[]" its allegedly unlawful agreements, SAC ¶ 82, an allegation that at

15 best, simply describes a continuing violation without any overt act. *Garrison*, 2015 WL

16 1849517, at *7 ("even when a plaintiff alleges a continuing violation, an overt act by the

17 defendant is required to restart the limitations period") (internal quotation omitted).

18          The SAC remains devoid of any "new or independent actions taken by Oracle after

19 October 14, 2010—i.e., within four years of the filing date of [the] complaint . . . ." *Id.*

20 Plaintiffs' descriptions of specific instances of alleged misconduct all occurred between March

21 2006 and March 2009. *See* SAC ¶¶ 30-33, 36-37, 40-47.  While plaintiffs assert that "Oracle

22 continued to enter into new Secret Agreements with companies . . . well into 2012," *id.* ¶ 49, and

23 that Oracle's allegedly unlawful agreements remained in effect through 2015, *id.* ¶ 74, plaintiffs

24 allege no "specific conduct" by Oracle after March 2009. *Garrison*, 2015 WL 1849517, at *7.

25 Indeed, there are only three allegations that even attempt to describe conduct by Oracle after

26 March 2009, none of which constitutes "a new or independent act."

27          First, plaintiffs allege that Antonio Miranda, who only worked at Oracle for three months

28 within the limitations period, "sat in on several recruiting meetings and was on calls . . . with

1   Safra Catz and Larry Ellison," during which "Ms. Catz carefully monitored and made certain that

2   employees from a do not hire list were not recruited."  SAC ¶ 54.  Even if presumed true, this

3   unspecific allegation fails to allege "when [or] where . . . these alleged phone calls . . . [and]

4   meetings took place."  *Garrison*, 2015 WL 1849517, at \*7.  But regardless, the Court should not

5   accept this allegation as true, as plaintiffs misrepresent the deposition testimony on which they

6   rely.  *See* RJN Ex. 17.[7]  During his deposition, Mr. Miranda testified that he never discussed

7   hiring or recruiting with either Ms. Catz or Mr. Ellison (*id.* at 41:10-42:14); that he had never

8   heard that Ms. Catz or Mr. Ellison were instructing Oracle employees not to hire employees from

9   other companies (*id.* at 42:15-19); and that he had no knowledge of any agreement Oracle had

10  with any other company not to solicit or hire their employees.  *Id.* at 42:20-43:9.[8]

11          Second, plaintiffs allege that in December 2009, Oracle "ratified its No Hire List" by

12  adding new companies, including CoreTech, and entered into a "secret" agreement with

13  CoreTech which "would not terminate until September 4, 2012."  SAC ¶ 49.  Plaintiffs, however,

14  do not allege the terms of any alleged agreement with CoreTech nor do they allege any "specific

15  conduct" by Oracle related to any alleged agreement with CoreTech after December 2009.  *See*

16  *id.*  These allegations too are insufficient because Oracle's "ratif[ication]" of its "no hire list" in

17  December 2009 is only a "reaffirmation" of its prior conduct (outside the limitations period), and

18  the mere operation "until September 4, 2012" of an agreement allegedly entered into in

19  December 2009 is not a "new and independent act" but is instead only "a reaffirmation of a

20  previous act."  *See Garrison*, 2015 WL 2015 1849517, at \*7; *see also Gorlick Distrib. Ctrs., LLC*

21

22  [7]       As explained in Oracle's request for judicial notice, plaintiffs' allegations regarding Mr.
23  Miranda rely on and mischaracterize Mr. Miranda's deposition testimony—the only testimony
    Mr. Miranda has provided in this case—and his testimony therefore may be considered in
24  deciding Oracle's motion.  *See Kneivel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (the
    incorporation by reference doctrine extends "to situations in which the plaintiff's claim depends
25  on the contents of a document . . . even though the plaintiff does not explicitly allege the contents
    of that document in the complaint.").

26  [8]       Mr. Miranda further testified that his only involvement with either Ms. Catz or Mr.
    Ellison during his tenure at Oracle was in the context of integrating technology systems when
27  Oracle acquired other companies, which did not involve hiring or recruiting.  *See* RJN Ex. 17 at
    45:21-46:19.  And contrary to plaintiffs' allegations, Mr. Miranda testified that he was hired by
28  Intuit from Oracle without any objection that his hiring violated any agreement between the two
    companies.  *See id.* at 36:15-39:3.

1  *v. Car Sound Exhaust Sys., Inc.*, 2010 U.S. Dist. LEXIS 120447, at *24-27 (W.D. Wash. Oct. 27,

2  2010) (no overt act where defendant only "reaffirmed" its policy of not selling to plaintiff).

3         Lastly, plaintiffs allege that "Oracle had agreements in place up until October 2014 and

4  after with various recruiting companies, including Riviera Partners, not to place Oracle

5  employees with other companies."  SAC ¶ 55.  Plaintiffs allege that an unnamed "Senior

6  Director at Oracle," who ended his employment with Oracle in 2014, was told by Riviera

7  Partners after he left Oracle "that it could not place [him] because it had an agreement with

8  Oracle not to perform job placement services for Oracle employees."[9]  *Id.*  To have a shot at

9  pleading a continuing violation based on this conduct, plaintiffs would have to plausibly allege

10 an agreement between Oracle and a recruiting company (including the who, what, when, where)

11 *and* that it was formed (the overt act) within the limitations period.  Even if the agreement were

12 described with the particularity required by *Twombly*, which it is not, the allegation that an

13 unnamed former Oracle employee was merely affected by it is not a "new or independent act" *by*

14 *Oracle*.  *Garrison*, 2015 WL 2015 1849517, at *7.

15        Plaintiffs also do not allege any "new" or "accumulating injury," as is required.  Plaintiffs

16 allege that as a result of Oracle's "ongoing enforcement" of its allegedly unlawful agreements,

17 they were unable to find employment at the technology company of "their choice" after leaving

18 Oracle and that they never received solicitations from other technology companies during their

19 employment at Oracle.  SAC ¶¶ 74-82.  Garrison alleges that from June 2009 until sometime in

20 2015, he was "unable to obtain gainful employment" despite applying to work at a number of

21 technology companies.  *Id.* ¶¶ 75-76.  Van Vorst alleges that she "was never directly solicited"

22 by any of the technology companies with whom Oracle allegedly had unlawful agreements, *id.* ¶

23 77; that she "submitted numerous applications . . . to technology companies" yet "never received

24 any call-backs, nor interview[s]," *id.* ¶ 78; and that she only found employment a year and a half

25

26 [9]     This allegation is not even internally consistent as it is unclear why an agreement "not to
place Oracle employees with other companies," would apply to a "former Oracle employee,"

27 such as the unnamed "Senior Director."  SAC ¶ 49, 55.  But even if the alleged agreement
extended to former Oracle employees, plaintiffs fail to explain how such an agreement relates to

28 their theory that Oracle conspired with recruiting companies to "suppress the compensation of
[Oracle's] *employees*."  *Id.* ¶¶ 2, 4.  (emphasis added).

1    after leaving Oracle at a non-technology company.  *Id.* ¶ 79.  Hari alleges that he never received

2    "any compensation raises" or "direct solicitations" while at Oracle, *id.* ¶ 80, and despite applying

3    to work at "certain" technology companies, he did not receive any job offers.  *Id.* ¶ 81.

4           Plaintiffs' allegation that they "continued to feel the impact of Oracle's anti-trust

5    violations" "[u]p until 2015" is insufficient.  *Id.* ¶ 74.  While plaintiffs allege that they each

6    applied to work at various technology companies, they do not provide the dates of any specific

7    application and rejection.  *See id.* ¶¶ 75, 78, 80.  Nor do they allege that they were ever told that

8    they were not hired or interviewed because of any agreement with Oracle; instead, they each

9    assume, without justification, that their failure to find employment at the technology company of

10   their choosing must have resulted from "the continued enforcement" of Oracle's allegedly

11   unlawful agreements.  *Id.* ¶ 73, 82.  But at best, plaintiffs have simply alleged that they continued

12   to suffer the *same* injury and not any *new* or *accumulating* injury.  *See, e.g.*, *David Orgell, Inc. v.*

13   *Geary's Stores, Inc.*, 640 F.2d 936, 938 (9th Cir. 1981) (plaintiff's injury resulted from supplier's

14   decision not to sell to plaintiff and supplier's subsequent refusals did not inflict new or

15   accumulating injury).  Plaintiffs thus have alleged no overt act by Oracle after October 14, 2010

16   and have failed to allege a continuing violation.

17          **2.     Plaintiffs Have Not Adequately Pled Fraudulent Concealment**

18          As the Court explained, to plead fraudulent concealment, plaintiffs must allege that: "(1)

19   the defendant took affirmative acts to mislead the plaintiff[s]; (2) the plaintiff[s] did not have

20   actual or constructive knowledge of the facts giving rise to [their] claim[s] as a result of the

21   defendant's affirmative acts; and (3) the plaintiff[s] acted diligently in trying to uncover the facts

22   giving rise to [their] claims."  *Garrison*, 2015 WL 1849517, at *8.  Plaintiffs bear the burden of

23   pleading fraudulent concealment with particularity, which requires that they "satisfy the

24   heightened standard under Rule 9(b)" and "allege an account of the time, place, and specific

25   content of the false representations as well as the identities of the parties to the

26   misrepresentations."  *Id.*  Plaintiffs must also "set forth what is false or misleading about a

27   statement, and why it is false."  *In re Animation Workers Antitrust Litig.* ("*AWAL*"), 2015 WL

28   1522368, at *8 (N.D. Cal. Apr. 3, 2015) (citation and quotation omitted).  Plaintiffs' allegations

1  of fraudulent concealment remain deficient because plaintiffs have failed to plead that Oracle

2  engaged in any affirmative misconduct, and the documents that they rely on demonstrate that

3  they had actual or constructive knowledge of the facts giving rise to their claims.

4  **a.      Plaintiffs Have Not Alleged Any Affirmative Misconduct**

5          To satisfy the first element of fraudulent concealment, plaintiffs must allege that Oracle

6  engaged in "affirmatively misleading conduct above and beyond the alleged conspiracy itself."

7  *AWAL*, 2015 WL 1522368, at *15.  It is not enough that "a defendant's acts are by nature self-

8  concealing."  *Garrison*, 2015 WL 1849517, at *9 (internal quotations omitted); *see also Volk v.

9  D.A. Davidson & Co.*, 816 F.2d 1406, 1416 (9th Cir. 1987) ("silence or passive conduct does not

10  constitute fraudulent concealment").  The defendant must have affirmatively mislead plaintiffs

11  regarding its allegedly unlawful conduct and the existence of plaintiffs' claims.  *See id.*

12  **(1)      Oracle Had No Duty To Disclose Its Allegedly Illicit
                Agreements To Plaintiffs**

13

14          Throughout the SAC, plaintiffs allege that Oracle failed to disclose its allegedly unlawful

15  agreements to its employees, including plaintiffs, or otherwise publicly announce its allegedly

16  illicit behavior.  *See* SAC ¶ 57 ("Oracle employees . . .were not apprised of any of these Secret

17  Agreements"), ¶ 95 ("Oracle made no public statements . . . that Oracle was committing antitrust

18  violations"); ¶ 103 (Oracle never "admitted that it had any agreements with any other company

19  not to solicit one another's employees.").  To emphasize this point, plaintiffs label Oracle's

20  allegedly unlawful agreements the "Secret" agreements.  *Id.* ¶ 2.  The Court, however, has

21  already held that Oracle "had no obligation to affirmatively disclose its allegedly illicit conduct."

22  *Garrison*, 2015 WL 1849517, at *8.  Accordingly, none of plaintiffs' allegations regarding

23  Oracle's purported failure to disclose its allegedly unlawful conduct can constitute affirmative

24  misconduct, as a matter of law.[10]  *See id.*

25

26

27  [10]     In a similar vein, plaintiffs complain that Oracle did not make public the documents that
it produced to the DOJ.  SAC ¶ 104.  Oracle, however, had no obligation to publish for public
28  consumption the documents it turned over to the DOJ.  And in any event, on May 1, 2015,
Oracle turned over to plaintiffs all of the documents it produced to the DOJ.  *See* ECF No. 84.

1

(2)    **Plaintiffs' Allegations Confirm That Oracle's Alleged Agreements And No-Hire List Were Widely Disclosed**

2

3        To give the appearance that Oracle attempted to keep its allegedly unlawful hiring

4    practices, including its "no-hire" list, a "secret," plaintiffs selectively quote or misrepresent

5    certain communications that Oracle produced to the DOJ and turned over to plaintiffs.  *See, e.g.*,

6    SAC ¶¶ 98-100.  But when the documents on which these allegations are based are viewed in

7    full, they, along with the other allegations in the SAC, demonstrate that Oracle's hiring policies

8    and agreements, as well as its "no-hire" list, were disseminated broadly to Oracle's human

9    resources and other employees, and were anything but secret.

10        For example, plaintiffs allege that in a January 17, 2008 email, Amanda Gill, an Oracle

11    human resources employee, wrote to another Oracle recruiter:  "DO NOT email any employees

12    of our partners or employees on our no-hire list – period," *id.* ¶ 98; and later the same day, wrote

13    to a different Oracle employee, "It is not our policy to solicit from our partners."  *Id.* ¶ 99.  It is

14    unclear why plaintiffs contend these allegations represent "an effort to conceal," *id.*, as on their

15    face, Ms. Gill is doing the opposite:  ensuring that other employees are aware of Oracle's hiring

16    policies and its no-hire list.  *Id.*  Indeed, when viewed in full, these communications demonstrate

17    that Ms. Gill openly discussed Oracle's *policy* of not soliciting employees from its partners, and

18    the existence of its no-hire list.  *See* RJN Exs. 3, 4.  These communications were not restricted to

19    the "most senior executives and the most senior employees [in Oracle's] human resources and

20    recruiting departments."  SAC ¶ 109.[11]  And nothing in these communications suggests that

21    Oracle attempted to conceal its hiring policies or no-hire list from its employees.

22        Similarly, plaintiffs allege that in an email dated February 12, 2008, David Nason, an

23    Oracle recruiter, sent a "no-hire list" to his "team" and "direct[ed] them to not forward" the list.

24    SAC ¶ 100.  Yet the remainder of the email, which plaintiffs ignore, shows that the updated no-

25    hire list at issue was "uploaded" to an Oracle website where it could be viewed by Oracle

26    ──────────────
[11]        For example, one of Ms. Gill's January 17 emails was sent to Angeline Barrozo, a

27    "partner liaison" in Oracle's consulting group who is neither an executive, nor a member of
Oracle's human resources group, at any level.  RJN Ex. 4.  Nor were either of Ms. Gill's emails

28    sent to another company with whom "Oracle [allegedly] had [a] . . . no-hire agreement[]," as
plaintiffs allege.  SAC ¶ 99; RJN Exs. 3, 4.

1   employees.  *See* RJN Ex. 6.  This is consistent with plaintiffs' other allegations throughout the

2   SAC that confirm that Oracle's no-hire list was circulated among Oracle's human resources

3   employees.  *See* SAC ¶ 31 (alleging that an Oracle recruiter "disseminated th[e] no-hire list to

4   Oracle's key human resource and recruiting personnel" despite a directive to supposedly keep

5   the list "highly confidential").  Plaintiffs' own allegations thus confirm that Oracle's hiring

6   policies, agreements, and no-hire list were disseminated among Oracle's human resources

7   personnel and other employees.[12]  In the face of this wide dissemination, plaintiffs cannot

8   plausibly allege that they lacked constructive knowledge of their claims nor that they were

9   diligent in pursuing them.  *See Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th

10   Cir. 2012) (plaintiff has constructive knowledge if he "had enough information to warrant an

11   investigation, which, if reasonably diligent, would have led to the discovery" of his claims).

12         But even accepting plaintiffs' mischaracterization, their allegations are insufficient

13   because they have not alleged anything other than the existence of a "secret conspiracy," which

14   the Court has already rejected.  *AWAL*, 2015 WL 1522368, at *15.  In dismissing the complaint

15   in *AWAL*, the Court held that plaintiffs' allegation that defendants' "senior human resources

16   directors and senior management discussed the conspiracy in small in person group meetings,

17   avoided memorializing the scheme in writing, and attempted to keep the conspiracy a secret,"

18   only constituted "passive[] conceal[ment]" and not any "affirmative misconduct" "above and

19   beyond" the conspiracy itself.  *Id.*  The same is true here.[13]

20   _____

21   [12]     Indeed, the documents plaintiffs rely on in the SAC demonstrate that Oracle's no-hire list
     was published internally on a website for Oracle's employees to view.  For example, on January
22   23, 2008, in explaining the types of agreements included in the no-hire list, Ms. Gill noted that it
     would be "poste[d] to [Oracle's] site" soon.  RJN Ex. 5.  And on December 29, 2009, Ms. Gill
23   forwarded an updated version of the no-hire list—the exact no-hire list that plaintiffs allege
     contains a "secret" agreement with CoreTech—and asked that it be "posted" for "publication
24   online."  RJN Ex. 9.  Plaintiffs' allegations are also contradicted by other evidence Oracle
     produced to the DOJ and to plaintiffs, which confirms that Oracle's no-hire list was widely
25   disseminated.  For example, the U.S. Manager's Resource Guide, which was distributed to all
     Oracle managers, which would have included the named plaintiffs, directed managers to a link
26   where they could access the "no-hire" list.  RJN Ex. 10. at 11-12, 22.

27   [13]     Plaintiffs emphasize that Conroy Shum, an Adobe employee, sent an email to Oracle's
     Christina Crowley from his "private" email account.  SAC ¶ 47.  Plaintiffs, however, fail to
28   explain how the conduct of an Adobe employee could constitute misconduct *by Oracle* nor how
     they could have been deceived by an email an Adobe employee sent, which they would have had
     no access to regardless of whether it was sent from his work or personal account.  Plaintiffs also

### (3)     Plaintiffs Have Alleged No Pretextual Or Misleading Statements

Plaintiffs lastly try to invoke fraudulent concealment by alleging that Oracle "concealed" its allegedly unlawful hiring policies and agreements by making false and misleading statements that it "complies with" the antitrust laws and that its compensation is "competitive" in its employee handbook, in filings with the SEC, and in response to inquiries from plaintiffs or putative class members.[14]  SAC ¶¶ 85-86, 89-94, 97,102.  None of these statements constitute affirmative misconduct or otherwise satisfy the pleading requirements imposed by Rule 9(b).

To constitute affirmative misconduct, plaintiffs must plead that Oracle made public, pretextual statements or other misrepresentations that "misled plaintiffs about the existence of the[ir] claims."  *AWAL*, 2015 WL 1522368, at *15.  For example, in *In re Lithium Ion Batteries Antitrust Litig.* ("*Lithium*"), 2014 WL 309192, at *16 (N.D. Cal. Jan. 21, 2014), the court found plaintiffs' allegations of fraudulent concealment sufficient where they alleged "a variety of mechanisms" by which the defendants had attempted to keep their alleged price-fixing scheme a secret *and* the defendants had not only publicly "affirm[ed] their compliance with applicable antitrust laws," but *also* made numerous statements regarding the "vigorous price competition in the lithium ion market."  The *Lithium* defendants' alleged misrepresentations were not generic statements of "competitiveness" but specific statements of price competition between competitors.  *See, e.g.*, RJN Ex. 13 ¶ 214(c) ("[W]e anticipate the harsh competition with South Korean makers will continue.  We are reviewing our production process to strengthen our cost competitiveness so that we can win the battle.").  Similarly, in *In re TFT-LCD Antitrust Litig.*, 586 F. Supp. 2d 1109, 1119 (N.D. Cal. 2008) ("*TFT*"), the court found that the plaintiffs had adequately alleged fraudulent concealment where defendants had provided "numerous specific pretextual reasons for the inflated prices of LCDs," including undercapitalization, undersupply,

---

falsely allege that Mr. Shum "admitted that he was worried" that Adobe's alleged agreement with Oracle was "illegal," *id.*, but the document plaintiffs purport to quote expresses no such worry (and indeed, shows that Adobe *was* actively hiring from Oracle).  RJN Ex. 8.

[14]  Plaintiffs also allege that "Oracle's denials go on to this day" and quote a statement made by Oracle's spokeswoman "on or about" October 14, 2014.  This statement, however, was made in direct response to the filing of Garrison's complaint and could not have played any role in deceiving plaintiffs as to the existence of their claims.  *See* RJN Ex. 15.

1   shortages, and rapid demand growth, to conceal their alleged price-fixing in the LCD market.

2   And in *In re Cathode Ray Antitrust Litig.* ("*CRT*"), 738 F. Supp. 2d 1011, 1024-25 (N.D. Cal.

3   2010), the court held that defendants' coordinated pretextual statements "blam[ing] price

4   increases [in the CRT market] . . . on a shortage of glass shells" constituted affirmative

5   misconduct.  In each of these cases, "[i]t was the combination of those misleading, pretextual

6   statements *and* [other] affirmative efforts taken to destroy evidence of the conspiracy or

7   otherwise keep the conspiracies secret that supported the . . . fraudulent concealment

8   allegations." *AWAL*, 2015 WL 1522368, at *16.  Plaintiffs' allegations pale in comparison.

9            **Employee Handbook**.  Plaintiffs allege that Oracle's "employee handbook," which

10  expresses Oracle's desire that its employees abide by the antitrust and competition laws in the

11  U.S. and other countries, allowed Oracle to "conceal" its allegedly unlawful hiring policies and

12  agreements.  *See* SAC ¶ 85 ("Oracle commits rigorously to observing applicable antitrust or

13  competition laws of all countries"); ¶ 86 ("We must each operate within the bounds of all laws,

14  regulations, and internal policies applicable to Oracle's business wherever we conduct it.").

15  Plaintiffs allege that based on reading the employee handbook, they believed that Oracle

16  complied with all laws and that they "had a firm understanding of the compensation structure" at

17  Oracle.  *Id.* ¶¶ 89, 90.[15]

18           To start, plaintiffs have failed to allege what, specifically, was misleading about Oracle's

19  statements in its employee handbook, as is required.  *See AWAL*, 2015 WL 1522368, at *8.

20  Oracle's aspirational statements and expectation that its employees act within the bounds of the

21  antitrust laws are "qualitatively different" than the specific misrepresentations alleged in *Lithium,*

22  *TFT*, and *CRT*.  *AWAL*, 2015 WL 1522368, at *16; *see also Retail Wholesale & Dep't Store*

23  *Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 52 F. Supp. 3d 961, 970 (N.D. Cal. 2014)

24  ("a code of ethics is inherently aspirational" and "it simply cannot be that every time a violation

25  of that code occurs, a company is liable . . . for having chosen to adopt the code at all") (internal

26  quotations omitted).  Nor is it reasonable to infer, as it was in those cases, that the statements in

27  ────────────────

28  [15]     The document that plaintiffs quote in their complaint and label Oracle's "employee
         handbook" is in fact Oracle's Code of Ethics and Business Conduct that is publicly available
         online.  RJN Ex. 16.

1   Oracle's employee handbook were pretextual, *i.e.,* made for the purpose of concealing its

2   allegedly unlawful hiring policies and agreements from plaintiffs.  Indeed, after the DOJ

3   investigated Oracle's hiring and recruiting practices in 2010 and took no action, SAC ¶ 53,

4   Oracle had every reason to believe that it *was* operating in accordance with the law.

5          Plaintiffs also have alleged no specific misrepresentation in the employee handbook

6   regarding Oracle's "compensation and commission structure."  *Id.* ¶ 90.  Nor could they, as the

7   employee handbook says nothing about employee compensation or commissions.  *See* RJN Ex.

8   16.  Accordingly, plaintiffs' allegations that their review of the employee handbook led them to

9   "believe[] they had a firm understanding" of Oracle's compensation structure is implausible and

10  fails to satisfy Rule 9(b).  *See Lithium*, 2014 WL 309192, at *16 ("a plaintiff's reliance on any

11  misstatement must be reasonable").

12         **SEC Filings**.  Plaintiffs also allege that Oracle made "false" statements in its SEC filings

13  in various years by representing that "there is substantial and continuous competition for highly

14  skilled business, product development, technical, and other personnel" and that Oracle might not

15  be able "to hire enough qualified employees or [might] lose key employees."  SAC ¶ 93.  Again,

16  plaintiffs have not alleged why this statement is misleading or otherwise deceived them as to the

17  existence of their claims; indeed, it is seemingly consistent with the allegations in their

18  complaint.  *Cf. id.* ¶ 25 ("Technology employees of all types, such as Plaintiffs, are in high

19  demand . . . .").  Plaintiffs also have not, and cannot, allege that the statements in Oracle's

20  regulatory filings were pretextual and made for the purpose of misleading plaintiffs as to the

21  existence of their claims.  Nor do plaintiffs ever allege that they read any of Oracle's SEC

22  filings, and therefore, could not have "reasonably relied" on their contents.  *AWAL*, 2015 WL

23  1522368, at *16 (rejecting allegations of fraudulent concealment where plaintiffs failed to allege

24  they relied on defendants' allegedly misleading statements).

25         **Statements That Oracle's Compensation Was Competitive**.  Plaintiffs also allege that

26  they were deceived as to the existence of their claims because they were told that Oracle's

27  compensation structure was "competitive."  SAC ¶¶ 90, 97.  Garrison alleges that at some

28  unspecified time, an unnamed "human resources employee . . . informed him . . . that Oracle's

commission structure was competitive . . . ." *Id.* ¶ 90; *see also id.* ¶ 97 (alleging unnamed Oracle employees told unnamed class members that "compensation was competitive"). Hari alleges that at an unknown time, an unnamed senior executive told him "to inform his team . . . that their compensation levels at Oracle were highly competitive . . . ." *Id.* ¶ 90. These allegations lack the detail required by Rule 9(b), including the "who, what, where, and when" of the allegedly false statement, or any explanation as to why it was misleading or pretextual. *Garrison*, 2015 WL 1849517, at *8. Moreover, as with the statements in Oracle's employee handbook, any promise of "competitiveness" is "qualitatively different" from the specific pretextual misrepresentations courts have found constitute affirmative misconduct. *See AWAL*, at *16 (rejecting plaintiffs' argument that defendants "deliberately misrepresent[ed] their suppressed compensation" by describing the results of a competition survey, which defendants participated in, as "competitive" when it "actually reported anticompetitive compensation"). Plaintiffs have thus alleged no affirmative misconduct by Oracle to deceive plaintiffs as to the existence of their claims and they have not plausibly alleged any fraudulent concealment.

### C. Plaintiffs Have Not Pled A Section 1 Claim[16]

#### 1. Plaintiffs Again Have Alleged No Plausible Agreement with Google

To state a Section 1 claim, plaintiffs must allege "enough factual matter . . . to suggest that an agreement was made" and "to raise a reasonable expectation that discovery will reveal evidence of [an] illegal agreement." *Twombly*, 550 U.S. at 556. This requires, at a minimum, that the complaint "answer the basic questions:  who, did what, to whom (or with whom), where, and when?" *High-Tech*, 856 F. Supp. 2d at 1116.

In dismissing Garrison's complaint, the Court found that it was "largely bereft of *any* dates or details with regards to Oracle's specific conduct" related to the alleged agreement with Google. *Garrison*, 2015 WL 1849517, at *7. The SAC does not cure this deficiency. The only

---

[16]    Plaintiffs allege antitrust claims under both the Sherman Act and the Cartwright Act. SAC ¶¶ 111-125. The analysis of plaintiffs' claim under the Cartwright Act "mirrors the analysis" under the Sherman Act, and if plaintiffs fail to plead a viable federal antitrust claim, their state law claim must also fail. *See High-Tech*, 856 F. Supp. 2d at 1114; *see also Rick-Mik Enters. Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 973, 975-76 n.5 (9th Cir. 2008) (applying *Twombly* to Cartwright Act claim).

new facts alleged are that Amanda Gill, Christina Crowley, Larry Ellison, and Safra Catz "reached" the alleged agreement with unnamed persons at Google "through direct and explicit communications" and that these "executives actively managed and enforced" the agreement "through direct, and indirect communications."  SAC ¶ 34.  But the SAC describes no communications between or among these executives and anyone at Google, despite having now received all of the documents that Oracle produced to the DOJ (which show that Oracle searched broadly for documents relating to Google during the time period plaintiffs allege the agreement was formed and enforced).  Plaintiffs' allegations regarding Oracle and Google remain as deficient as in the original complaint and fail to allege a plausible agreement.

The sole other new allegation which describes Google's conduct, SAC ¶ 33, confirms that there was no agreement between Oracle and Google.  On its face, the quoted language describes Google's hiring "rule," and says nothing of an agreement between Oracle and Google. *Id.*  While omitted, the next sentence of the quoted October 2007 Google email makes clear that it was Google's "policy" not to hire product, sales, or general or administrative candidates at the manager level from Oracle.  RJN Ex. 1.  Plaintiffs' artful pleading cannot make Google's unilateral hiring policies actionable, especially against *Oracle*.

### 2.    Plaintiffs' New "Conspiracy" Is Also Not Plausible

Not finding any evidence to support their allegations of an unlawful agreement with Google—the predicate conduct giving rise to plaintiffs' lawsuit—plaintiffs have taken the documents Oracle produced to the DOJ out of context and mischaracterized them in an attempt to allege an entirely different conspiracy.   Plaintiffs' new "conspiracy" alleges that Oracle entered into a "plethora" of "secret" bilateral agreements with "other technology companies" and "the technology departments of non-technology based companies," whereby Oracle and the other company involved agreed not to solicit each other's employees.  SAC ¶¶ 2-3, 7, 9.  Plaintiffs contend that Oracle orchestrated this scheme by tracking its non-solicitation arrangements on a "no-hire" list, which it "amended" "multiple times every year."  *Id.* ¶¶ 26-27, 49.

Throughout the SAC, plaintiffs insinuate that Oracle participated in the "overarching

1   conspiracy" at issue in the *High-Tech* case.[17]  But plaintiffs have not pled a single fact tying

2   Oracle to the *High-Tech* conspiracy.  Nor do plaintiffs' allegations of unrelated agreements

3   ancillary to legitimate business collaborations look anything like the "overlapping" and "nearly

4   identical" non-solicitation agreements at issue in the *High-Tech* case, which were entered into by

5   "a small group of executives" who "knew of the other bilateral agreements to which their own

6   firms were not a party," and which were *not* "link[ed] . . . to any collaboration."[18]  *In re High-*

7   *Tech Empl. Antitrust Litig.* ("*High-Tech II*"), 2014 U.S. Dist. LEXIS 110064, at *60, 62-63

8   (N.D. Cal. Aug. 8, 2014) ("none of the documents that memorialize broad anti-solicitation

9   agreements mentions collaboration").  Each of plaintiffs' allegations of misconduct is based on a

10  mischaracterization of the documents Oracle produced to the DOJ and is markedly different from

11  the agreements at issue before the DOJ or in the *High-Tech* case.

12          Like the Court, the DOJ condemned the non-solicitation agreements at issue in the *High-*

13  *Tech* case as "naked restraints" that were *per se* unlawful because they were *not* "limited by

14  geography, job function, product group, or time period" and therefore, "were much broader than

15  reasonably necessary for the formation or implementation of any collaborative effort."  RJN Ex.

16  11 ¶ 16; *see also High-Tech II*, 2014 U.S. Dist. LEXIS 110064, at *63.  The DOJ, however,

17  recognized in its consent decree with the *High-Tech* defendants that non-solicitation agreements

18  that *are* narrowly tailored and ancillary to a legitimate business collaboration are entirely lawful,

19  and the consent decree expressly allows the *High-Tech* defendants to enter into a broad range of

20  non-solicitation agreements, including those that are "reasonably necessary" for "contracts with

21  consultants [or]. . . recruiting agencies" or "contracts with [other] providers or recipients of

22  services."  RJN Ex. 12 ¶ V.A.  Because the DOJ expressly provided that narrow non-solicitation

23  agreements ancillary to a legitimate business purpose are permissible, plaintiffs do not state an

24

25  [17]      Plaintiffs attempt to link Oracle to the agreements alleged in the *High-Tech* case in an
     effort to take advantage of the factual and legal determinations made previously, to which they
26  are not entitled.  Moreover, while the DOJ and the *High-Tech* plaintiffs *alleged* that the
     agreements at issue were *per se* unlawful, that issue was never decided.

27  [18]      Plaintiffs' allegations differ in this respect from the complaint in *AWAL*—which plaintiffs
     liberally copy—as the *AWAL* plaintiffs allege that the defendants entered into the same "do not
28  cold call" agreements that were at issue in the *High-Tech* case.  *AWAL*, 2015 WL 1522368, at
     *3-5; *see also* RJN Ex. 18 ¶¶ 2, 44, 52-58.

1  antitrust claim by pointing to several unrelated examples of those types of agreements and

2  labeling them "secret" and a "conspiracy."

3         Yet that is precisely what the SAC does.  For example, plaintiffs allege that Intuit was a

4  "permanent fixture" on Oracle's no-hire list and that Oracle had "an anti-solicitation and no-hire

5  agreement" with Intuit.  SAC ¶¶ 27, 29.  But the December 29, 2009 no-hire list which plaintiffs

6  reference confirms that any non-solicitation arrangement with Intuit was included in an

7  agreement ancillary to a legitimate business relationship, limited to "the West Regional

8  [Division] of Oracle Consulting," and provided only that "[n]either party [would] solicit for

9  employment or retention as an independent contractor any employee or former employee of the

10  other who provided services" pursuant to the parties' services agreement.  RJN Ex. 9.  The

11  language included in the no-hire list is consistent with the internal Intuit communications

12  plaintiffs partially quote, which reference potential limitations on soliciting an Oracle

13  "consultant" that Intuit was about to engage for a particular project, *i.e.*, a "statement of work."

14  *See* SAC ¶ 29; RJN Ex. 2.  Plaintiffs also allege that Oracle entered into a "secret" agreement

15  with CoreTech and added CoreTech to its no-hire list on December 29, 2009.  SAC ¶ 49.

16  Plaintiffs do not allege the terms of any alleged agreement with CoreTech but the no-hire list

17  plaintiffs rely on describes a term-limited non-solicitation clause related to a particular

18  consulting statement of work.  RJN Ex. 9; *see supra* at 5.

19         Likewise, the communications plaintiffs quote to allege a non-solicitation agreement with

20  Adobe discuss Adobe's solicitation of Oracle's employees in Europe, the Middle East, and

21  Africa, which is outside of any alleged relevant market (and took place well outside the

22  limitations period, in any event).  *See* RJN Ex. 7 (Oracle complained that "Adobe in EMEA is

23  looking to hire and sending emails to [Oracle's] team in the UK"), Ex. 8; *see also* SAC ¶ 64

24  (seeking to represent a class of U.S. based Oracle employees).[19]

25         Throughout the complaint, plaintiffs also challenge as unlawful Oracle's "policy" of not

26  directly soliciting the employees of its business partners and customers, which included at least

27  ─────────────

28  [19]     Indeed, plaintiffs' recently served deposition notices seek to depose four employees from Oracle's EMEA division—Anne-Marie O'Donnell, Nick Foster, Mark Van Wolferen, and Vance Kearney—who are all located in Europe or the Middle East.  *See* ECF No. 106 at 13.

1    IBM and Deloitte.  *Id.* ¶ 41 ("our policy is and continues to be that we do not directly solicit

2    from our partners"); ¶ 99 ("It is not our policy to solicit from our partners").  But Oracle's

3    independent decision making and unilateral hiring policies do not allege an agreement or any

4    anticompetitive conduct.  *See Credit Bureau Servs.v. Experian Info. Solutions, Inc.*, 2013 U.S.

5    Dist. LEXIS 94313, at *20-22 (C.D. Cal. June 28, 2013); *see also* RJN Ex. 12 ¶ V.E (expressly

6    permitting unilateral policies not to solicit from another company).  Moreover, any alleged

7    agreement with IBM did not apply to all employees, but only to consultants, SAC ¶ 30, and thus

8    falls into a category of non-solicitation agreements expressly permitted by the DOJ.  *See* RJN

9    Ex. 12 ¶ V.A.3.

10          Finally, Oracle's maintenance of a list tracking its permissible contractual non-

11   solicitation arrangements—the crux of plaintiffs' amended pleading—also does not allege any

12   anticompetitive or illicit conduct.  The DOJ's consent decree entered with the *High-Tech*

13   defendants *requires* that those companies keep records tracking their permissible non-solicitation

14   arrangements, which is exactly what plaintiffs allege Oracle has done here.  *See* RJN Ex. 12 ¶¶

15   V.B, V.C, VI.A.6.  Thus the very documents that plaintiffs rely on to allege a conspiracy reveal

16   no agreement or other anticompetitive conduct, and instead, describe exactly the kind of limited

17   non-solicitation arrangements that the DOJ defined as permissible conduct.  *See id.*; *see also* RJN

18   5 (explaining that the no-hire list includes contractual provisions and that it "[i]t is necessary to

19   read each clause to understand the scope of the no-hire language" and that the terms only relate

20   to "people who have worked on an Oracle implementation project").  It is likely for this reason

21   that, after reviewing the same documents that plaintiffs find so troublesome, the DOJ closed its

22   investigation without taking any action.

23          When courts encounter non-solicitation agreements such as those at issue here, they

24   evaluate them under the rule of reason, and dismiss complaints that only allege narrowly tailored

25   restrictions that are ancillary to a legitimate business collaboration.  *See, e.g.*, *Ulrich v. Moody's

26   Corp.*, 2014 U.S. Dist. LEXIS 145898, at *85-94 (S.D.N.Y. Mar. 31, 2014) (applying rule of

27   reason and dismissing claim premised on alleged agreement between Moody's and S&P not to

28   "poach" each other's analysts); *Molinari v. Consol Energy Inc.,* 2012 WL 4928489, at *4 (W.D.

1   Pa. Oct. 16, 2012) (rejecting application of *per se* treatment and dismissing claim based on

2   contractual no-hire provision); *Haines v. VeriMed Healthcare Network, LLC*, 613 F. Supp. 2d

3   1133, 1137 (E.D. Mo. 2009) (dismissing claim premised on "narrow[ly] tailored" no-hire

4   restriction and recognizing that such provisions are "a common feature of countless independent

5   contractor relationships in any number of industries").  As in these cases, plaintiffs' allegations

6   are insufficient to state a claim under the rule of reason because the agreements, policies, and

7   conduct they challenge are reasonable and permissible, as a matter of law.

8       **D.      Plaintiffs Also Fail To State A UCL Claim**

9           Plaintiffs' UCL claim is identical to the UCL claim Garrison alleged in his original

10  complaint.  Plaintiffs allege that Oracle's allegedly unlawful hiring and non-solicitation

11  agreements were "unlawful, unfair, and or unconscionable" under the UCL and caused plaintiffs

12  injury by "suppressing the value of managerial employees' services and thus suppressing their

13  wages."  SAC ¶¶ 130-31.  As their remedy for their UCL claim, plaintiffs seek disgorgement and

14  restitution of "the money or property unfairly withheld from them."  *Id.* ¶ 132.  But as Oracle

15  explained in its motion for judgment on the pleadings (ECF Nos. 17, 29), and again when it

16  served plaintiffs' counsel with a Rule 11 motion (ECF No. 65 at 2), plaintiffs cannot state a UCL

17  claim because this Court has already held that the higher compensation they allege they would

18  have received in the absence of Oracle's alleged misconduct is not a "vested interest" that may

19  be recovered as restitution or disgorgement.[20]

20          In the *High-Tech* case, the Court dismissed plaintiffs' UCL claim seeking disgorgement

21  and restitution to remedy the alleged "elimination of competition and suppression of

22  compensation and mobility."  *High-Tech*, 856 F. Supp. 2d at 1124.  The Court explained that

23  "the speculative higher compensation Plaintiffs may have gotten in the absence of the alleged

24  conspiracy, unlike unpaid wages, is not a vested interest . . . that may be compensated through

25  restitution or disgorgement."  *Id.*  The Court found, instead, that the higher compensation

26  

27  
[20]     Plaintiffs' UCL claim is also deficient because they have not alleged viable claims under the Sherman Act, Cartwright Act, or Section 16600, and as a result, there is no "unlawful, unfair, . . . or unconscionable" conduct giving rise to their UCL claim.  *See, e.g., Orchard Supply*

28  *Hardware LLC v. Home Depot USA, Inc.*, 939 F. Supp. 2d 1002, 1011 (N.D. Cal. 2013) (dismissing UCL claim where plaintiff failed to plead viable claims under any other law).

1   plaintiffs' alleged they would have received "in the absence of the alleged conspiracy" was "an

2   'attenuated expectancy'" that could not "serve as the basis for restitution." *Id.* (quoting *Korea*

3   *Supply Co. v Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1150-51 (2003)).  Plaintiffs' UCL claim

4   fails for the same reason and must be dismissed.[21]

5          **E.     Plaintiffs Lack Article III Standing To Seek Injunctive Or Declaratory Relief**

6          In addition to treble damages, plaintiffs also seek a permanent injunction enjoining

7   Oracle from "ever again entering into similar agreements." SAC ¶ 142.  They also request

8   declaratory relief and a permanent injunction as a remedy for their state law claim under Section

9   16600.[22] *Id.* ¶ 135.  But as former Oracle employees to whom Oracle's allegedly unlawful

10  conduct no longer applies, plaintiffs lack standing under Article III to pursue either injunctive or

11  declaratory relief.

12         In the context of a request for injunctive or declaratory relief, plaintiffs must demonstrate

13  "a real or immediate threat of an irreparable injury" to establish constitutional standing.  *Clark v.*

14  *City of Lakewood*, 259 F.3d 996, 1007 (9th Cir. 2001); *Gest v. Bradbury*, 443 F.3d 1177, 1181

15  (9th Cir. 2006) (plaintiffs must "demonstrate that [they are] realistically threatened by a

16  repetition of the violation.").  "Past exposure to illegal conduct does not itself show a present

17  case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present

18  adverse effects."  *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974).

19         Plaintiffs' allegations are insufficient on their face to establish Article III standing.  The

20  agreements alleged, by their terms as pled, do not restrict the hiring or soliciting of *former* Oracle

21  employees like plaintiffs.  *See, e.g.*, SAC ¶ 2 (alleging a conspiracy "to fix and suppress the

22  compensation of *their employees*"); ¶ 26 ("Oracle established a 'no-hire' list to prevent other

23  technology companies from hiring *its employees* in exchange for Oracle's agreement not to hire

24

25  [21]     In his opposition to Oracle's motion for judgment on the pleadings, Garrison argued that
    the Court's decision in the *High-Tech* case did not preclude him from recovering as restitution
26  "the difference between what [Oracle] actually paid [Garrison] and the true value of services
    [Garrison] actually provided," *see* ECF. No. 21 at 20, but that is *exactly* what the Court held.  *See*
27  *High-Tech*, 856 F. Supp. 2d at 1124.  Plaintiffs' counsel's continued prosecution of this legally
    meritless claim plainly violates Rule 11.

28  [22]     The only relief plaintiff seeks under Section 16600, and the only relief available, is an
    injunction or declaratory judgment and thus any lack of standing dooms plaintiffs' claim.

1  those other firm's *employees*"); ¶ 60 "("the effects of [the alleged] hiring restrictions impact all

2  *employees* of participating companies") (emphasis added).  Nor is it plausible that the

3  agreements alleged applied to Oracle's former employees, as the purpose of the alleged

4  "conspiracy"—suppressing the mobility and compensation of *employees* at the participating

5  companies (*see id.* ¶¶ 2, 4, 9, 60)—would not be achieved by refraining from hiring or soliciting

6  *former* employees.  *See William O. Gilley Enters. Inc.*, *v. Atl. Richfield Co.,* 588 F.3d 659, 662

7  (9th Cir. 2009) (an antitrust claim must be "'plausible' in light of basic economic principles").

8  As a result, Oracle's allegedly unlawful agreements, even if still in effect, ceased to apply to

9  plaintiffs once they left Oracle.  The prospective declaratory and injunctive relief they seek

10  therefore cannot redress any injury nor can it protect plaintiffs from any "real or immediate

11  threat" of harm, because there is none.[23]  Plaintiffs, as former employees, lack standing to seek

12  declaratory or injunctive relief.

13  **VI.    CONCLUSION**

14       Plaintiffs filed this lawsuit based on a single document produced in the *High-Tech*

15  litigation and apparently without first undertaking any Rule 11 investigation.  Despite failing to

16  state a claim, they proceeded with discovery, which has only confirmed that their original claims

17  are meritless, and so, plaintiffs are now using the discovery process—and will continue to do so

18  while Oracle's second dismissal motion is pending—in an attempt to allege a new and entirely

19  different case, all at great expense and inconvenience to Oracle.  It is to avoid this "enormous

20  expense of discovery in cases with no reasonably founded hope" that the Supreme Court requires

21  that plaintiffs allege a "plausible" agreement to state a claim.  *Twombly*, 550 U.S. at 556, 560.

22  Plaintiffs have now had three chances to do so but failed in each attempt.  Their claims should be

23  dismissed, this time with prejudice.

24

25

---

26  [23]    Courts routinely find that former employees lack standing to seek injunctive or
declaratory relief against a former employer's employment practices.  *See, e.g.*, *Wal-Mart Stores,*
27  *Inc. v. Dukes*, 131 S. Ct. 2541, 2559-60 (2011); *Zanze v. Snelling Servs.*, LLC, 412 F. App'x
994, 997 (9th Cir. 2011); *Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1037 (9th Cir.
28  2006); *Slack v. Int'l Union of Operating Eng'rs*, 2014 U.S. Dist. LEXIS 115568, at *77 (N.D.
Cal. Aug, 19, 2014).

1    Dated:  June 25, 2015                    Respectfully submitted,

2

3                                            By /s/ Sarah M. Ray
                                                 Sarah M. Ray

4                                            LATHAM & WATKINS LLP
                                                 Daniel M. Wall (Bar No. 102580)
5                                                Sarah M. Ray (Bar No. 229670)
                                                 505 Montgomery Street, Suite 2000
6                                                San Francisco, California 94111-6538
                                                 Telephone: (415) 391-0600
7                                                Email: dan.wall@lw.com
                                                 Email: sarah.ray@lw.com

8
                                                 Elyse M. Greenwald (Bar No. 268050)
9                                                John Hancock Tower, 27th Floor
                                                 200 Clarendon Street
10                                               Boston, Massachusetts 02116
                                                 Telephone: (617) 948-6000
11                                               Email: elyse.greenwald@lw.com

12                                           ORACLE CORPORATION
                                                 Dorian Daley (Bar No. 129049)
13                                               Deborah K. Miller (Bar No. 95527)
                                                 James C. Maroulis (Bar No. 208316)
14                                               500 Oracle Parkway
                                                 Redwood Shores, California 94065
15                                               Telephone: (650) 506-5200
                                                 Email: dorian.daley@oracle.com
16                                               Email: deborah.miller@oracle.com
                                                 Email: jim.maroulis@oracle.com

17
                                             Attorneys for Defendant
18                                           ORACLE CORPORATION

19

20

21

22

23

24

25

26

27

28