1  JEFFREY L. HOGUE, ESQ. (SBN 234557)
   TYLER J. BELONG, ESQ. (SBN 234543)
2  BRYCE A. DODDS, ESQ. (SBN 283491)
   HOGUE & BELONG
3  430 Nutmeg Street, Second Floor
   San Diego, CA 92103
4  Telephone No: (619) 238-4720
   Facsimile No: (619) 270-9856
5  jhogue@hoguebelonglaw.com
   tbelong@hoguebelonglaw.com
6  bdodds@hoguebelonglaw.com

7  DAVID R. MARKHAM, ESQ. (SBN 071814)
   PEGGY REALI, ESQ. (SBN 153102)
8  JANINE MENHENNET, ESQ. (SBN 163501)
   MAGGIE K. REALIN, ESQ. (SBN 263639)
9  THE MARKHAM LAW FIRM
   750 B Street, Suite 1950
10 San Diego, CA 92101
   Telephone No.: (619)399-3995
11 Facsimile No.: (619) 615-2067
   dmarkham@markham-law.com
12 preali@markham-law.com
   jmenhennet@markham-law.com
13 mrealin@markham-law.com

14 *Attorneys for Plaintiffs*

15 [Additional Counsel Listed on Signature Page]

16 **UNITED STATES DISTRICT COURT**

17 **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

18 **SAN JOSE DIVISION**

| | |
|---|---|
| 19 GREG GARRISON, DEBORAH VAN VORST, and SASTRY HARI, individually and on behalf of all others similarly situated, | ) Civil Case No. 5:14-cv-04592-LHK |
| 20 | ) **PLAINTIFFS' MEMORANDUM OF POINTS** |
| 21 | ) **AND AUTHORITIES IN OPPOSITION TO** |
| | ) **DEFENDANT'S MOTION TO DISMISS** |
| 21 Plaintiffs | ) **SECOND AMENDED CLASS ACTION** |
| 22 | ) **COMPLAINT** |
| 22 vs. | ) |
| 23 | ) |
| ORACLE CORPORATION, | ) Date:    October 15, 2015 |
| 24 | ) Time:    1:30 p.m. |
| Defendant | ) Ctrm:    8, 4th Floor |
| 25 | ) Judge:   The Honorable Lucy H. Koh |
| 26 | ) |
| 27 | ) |
| 28 | ) |

# TABLE OF CONTENTS

**Page(s)**

I.     INTRODUCTION. .................................................................................................1

II.    ARGUMENT. .......................................................................................................2

    A.     A Summary Of The Additional Factual Allegations In The FAC. ........................2

    B.     Plaintiffs' Claims Are Timely. .................................................................5

        1.     Plaintiffs Had No Notice Of Oracle's Conduct Until May of 2013. ............5

        2.     The Statutes of Limitations Have Been Tolled By The Pendency of Governmental Proceedings. ..................................................................7

        3.     The Discovery Rule Applies To Plaintiffs' UCL Claims To The Extent They Are Based On Defendant's Deceptive Practices. ...............9

        4.     Plaintiffs Have Adequately Pled A Continuing Violation. .........................10

        5.     The Continuous Accrual Doctrine Under California Law Also Applies. ..................................................................................12

        6.     Plaintiffs Have Adequately Pled Fraudulent Concealment. ........................13

    C.     Plaintiffs Have Adequately Pled A Conspiracy. ..................................................15

    D.     Plaintiffs Have Adequately Pled Their State Law Claims. ...................................16

IV.    CONCLUSION. ..................................................................................................19

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Federal Cases**

4

5

*In re Animation Workers Antitrust Litig.*,
  No. 14-CV-04062-LHK, 2015 WL 1522368 (N.D. Cal. Apr. 3, 2015) ..................... 9, 13, 14

6

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*,
  620 F.2d 1360 (9th Cir. 1980) ........................................................................................... 11

7

8

*Chipanno v. Champion Int'l Corp.*,
  702 F.2d 827 (9th Cir. 1983) ............................................................................................... 8

9

10

*Columbia Steel Casting Co. v. Portland General Elec. Co.*,
  111 F.3d 1427 (9th Cir. 1996), *cert. denied*, 523 U.S. 1112 (1998).................................. 10

11

*Dungan v. Morgan Drive-Away, Inc.*,
  570 F.2d 867 (9th Cir.), *cert. denied*, 439 U.S. 829 (1978)................................................. 7

12

13

*Fenerjian v. Nongshim Co.*,
  No. 13-CV-04115-WHO, 2014 WL 5685562 (N.D. Cal. Nov. 4, 2014) ............................... 9

14

15

*Flying J, Inc. v. TA Operating Corp.*,
  No. 1:06-CV-30-TC, 2007 WL 4165749 (D. Utah Nov. 20, 2007) ....................................... 6

16

*Garrison v. Oracle Corp.*,
  No. 14-CV-04592-LHK, 2015 WL 1849517 (N.D. Cal. Apr. 22, 2015) ...................... *passim*

17

18

*Hennegan v. Pacifico Creative Serv., Inc.*,
  787 F.2d 1299 (9th Cir.), *cert. denied*, 479 U.S. 886 (1986)................................................ 10

19

20

*In re High-Tech Employee Antitrust Litig.*,
  856 F. Supp. 2d 1103 (N.D. Cal. 2012) ........................................................................ *passim*

21

*Hinds County, Miss. v. Wachovia Bank, N.A.*,
  885 F. Supp. 2d 617 (S.D.N.Y. 2012)................................................................................... 8

22

23

*In re K-Dur Antitrust Litig.*,
  338 F. Supp. 2d 517 (D.N.J. 2004) ..................................................................................... 11

24

*Leh v. Gen. Petroleum Corp.*,
  382 U.S. 54 (1965).................................................................................................................. 8

25

26

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-MD-2420 YGR, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014).................................. 13

27

28

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-MD-2420 YGR, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014)........................... 13, 14

*Ryan v. Microsoft Corp.*,
No. 14-CV-04634-LHK, 2015 WL 1738352 (N.D. Cal. Apr. 10, 2015) .......................*passim*

*Samsung Electronics Co. v. Panasonic Corp.*,
747 F.3d 1199 (9th Cir. 2014), *cert. denied*, 135 S.Ct. 1157 (2015).....................................10

*Schenker AG v. Société Air France*,
No. H-CV-04711 JG VVP, 2015 WL 1951422 (S.D.N.Y. Apr. 23, 2015) ..........................12

*In re Scrap Metal Antitrust Litig.*,
No. 1:02 CV 0844, 2006 WL 2850453 (N.D. Ohio Sept. 30, 2006) ..................................8, 9

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
401 U.S. 321 (1971)..........................................................................................................8

**State Cases**

*Aryeh v. Canon Business Solutions, Inc.*,
55 Cal.4th 1185 (2013) .................................................................................1, 9, 12, 13

**Federal Statutes**

15 U.S.C. § 1 ...................................................................................................................1

15 U.S.C. § 16(i) .................................................................................................1, 7, 8, 9

**State Statutes**

Cal. Bus. & Prof. Code § 16600, *et seq*. ..................................................1, 2, 17, 18

Cal. Bus. & Prof. Code § 16720, *et seq*. ...................................................................1

Cal. Bus. & Prof. Code § 17200, *et seq*. ...................................................................1

**Rules**

Fed. R. Civ. P. 12(b)(6)...............................................................................................11, 16

Fed. R. Civ. P. 56 ...............................................................................................................11

# I.     INTRODUCTION.

This Court previously granted a partial judgment on the pleadings with respect to Plaintiff Greg Garrison's ("Garrison") original complaint on the ground that his federal antitrust cause of action under 15 U.S.C. § 1 and their three California law causes of action— under the Cartwright Act (Cal. Bus. & Prof. Code § 16720, *et seq*.), the Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq*.) ("UCL"), and Cal. Bus. & Prof. Code § 16600, *et seq*. ("Section 16600")—were time-barred. *Garrison v. Oracle Corp*., No. 14-CV-04592-LHK, 2015 WL 1849517, at *6-9 (N.D. Cal. Apr. 22, 2015) ("*Garrison*"). It gave Garrison leave to amend to plead more sufficiently the facts of Defendant Oracle Corporation's ("Oracle" or "Defendant") non-solicitation and restrictive hiring agreements, continuing conspiracy and fraudulent concealment. Garrison, along with newly-added Plaintiffs Deborah Van Vorst and Satry Hari (collectively "Plaintiffs") have done so, adding over 50 new paragraphs in their "Second Amended Antitrust Class Action Complaint," (June 5, 2015) (Dkt. No. 105) ("SAC").

Oracle has responded by moving to dismiss, both on statute of limitations theories ("Defendant Oracle Corporation's Notice And Motion To Dismiss Plaintiffs' Second Amended Antitrust Class Action Complaint," 7-18 (June 25, 2015) (Dkt. No. 110) ("Oracle Br.")) and on the grounds that Plaintiffs have failed to allege a plausible conspiracy (*id*. at 18-23), that Plaintiffs are not entitled to restitution under the UCL (*id*. at 23-24); and that Plaintiffs lack Article III standing to bring a claim under Section 16600 (*id*. at 24-25).

The statute of limitations arguments are rebutted by the new allegations in the SAC. They are also rebutted pursuant to statutes or principles not discussed by the Court in *Garrison*, such as 15 U.S.C. §16(i) and the doctrine of "continuous accrual" recognized by the California Supreme Court in *Aryeh v. Canon Business Solutions, Inc*., 55 Cal.4th 1185(2013) ("*Aryeh*"). The argument concerning a purported lack of plausibility runs afoul of the Court's prior ruling in *In re High-Tech Employee Antitrust Litig*., 856 F. Supp. 2d 1103, 1123 (N.D. Cal. 2012) ("*High-Tech*") and relies upon an attempt to transform a dismissal motion into one for summary judgment. The alleged lack of ability to obtain restitution ignores the fact that

Plaintiffs have other injunctive remedies under the UCL. And Article III standing for a Section 16600 claim is a low hurdle that Plaintiffs easily overcome in the SAC.

## II.   ARGUMENT.

### A.   A Summary Of The Additional Factual Allegations In The FAC.

Any analysis of Oracle's present motion has to begin with the additions that Plaintiffs made to the FAC in response to the Court's stated concerns about their original complaint.

In *Garrison*, the Court noted that Plaintiffs' original complaint was "bereft of *any* dates or details with regards to Oracle's specific conduct." *Garrison*, 2015 WL 1738352, at *7. The SAC cures that problem; Plaintiffs wrote it with the benefit of access to documents obtained from the United States Department of Justice's ("DOJ") investigation into Oracle's secret employee non-solicitation and restrictive hiring agreements with other companies (collectively "Secret Agreements") and resultant "do not hire" list. Paragraphs 21 through 57 of the SAC detail extensively the evolution of Oracle's Secret Agreements to suppress wage competition for its managers and engineers.

Oracle maintained both written Secret Agreements with various companies and oral "gentleman's agreements." SAC ¶¶ 27-28, 31. The first company to appear on Oracle's "do not hire" list was Intuit, which also appeared on a similar list by Google. *Id.* ¶ 29. In May of 2007, Oracle and Google entered into a similar restricted hiring agreement with respect to managerial employees. Google's own documents reflect this mutual pact. *Id.* ¶¶ 32-33. The agreement was reached through direct communications with Amanda Gill ("Gill") (Oracle's Director of Recruiting), Christina Crowley ("Crowley") (an Oracle Vice-President for its Global License Managing Services), Safra Catz ("Catz") (Oracle's CEO/CFO) and Larry Ellison. Exhibit 9 to Defendant's request for judicial notice ("DRJN") is a December 29, 2009 iteration of Oracle's "no hire" list that was circulated by Gill; it lists dozens of written agreements—many involving high-technology companies—that typically contain mutual restrictive hiring clauses that extend six months after any business dealings between the two companies and a liquidated damage clause providing for a $10,000 payment. Included in this list is a mutual no-hire pact with

Intuit. This list is non-inclusive. It does not reflect the "gentleman's agreements" with companies like Google or Adobe. *Id.* ¶107.

The Secret Agreements were rigorously enforced. Gill sent an e-mail to her recruiting team reminding them that "we do not directly solicit [employees] from our partners." *Id.* ¶ 41. In February of 2007, Oracle complained in writing about Adobe's poaching of its personnel and threatened litigation for breach of its agreement with Adobe. *Id.* ¶ 37. Adobe towed the line and the SAC recounts multiple conversations between Crowley and Corey Shum, a Director of Adobe, regarding efforts by the latter to stop any active recruiting of Oracle employees. *Id.* ¶¶ 45-47. Examples involving other companies, like IBM, are given in the SAC. *Id.* ¶¶ 41-44. The use of liquidated damage provisions ranging as high as $25,000 was common. *Id.* ¶36.

These activities continued after the DOJ commenced its inquiry into unlawful recruiting practices in the high technology industry in 2009. The "no hire list" referred to above was generated after that investigation began and Oracle was adding new agreements to that list "well into 2012." *Id.* ¶49.

In *Garrison*, this Court took the view that Plaintiffs needed to do more in alleging a continuing conspiracy by citing events that occurred after October 14, 2010—four years before the filing of Plaintiffs' original complaint. *Garrison*, 2015 WL 1849517, at *6-7. In addition to the paragraphs quoted above, the SAC is replete with new allegations that address this issue:

> Beginning in 2006, Oracle amended its "No Hire List" multiple times every year – each time adding additional companies to the "No Hire List", thereby memorializing the Secret Agreement Oracle had entered into with each new company. Even after the DOJ began its investigation in August 2009, Oracle continued to ratify the Secret Agreements and enter additional new Secret Agreements with new companies. By way of example, in December 2009, well after Oracle was made aware of the DOJ's investigation, Oracle ratified its "No Hire List" by adding new companies to the list and updating the dates that the Secret Agreements with each company had been reviewed, and the dates each of the Secret Agreements were set to be renewed in the future. According to the "No Hire List" that was modified after the DOJ began its investigation of Oracle, the Secret Agreements Oracle had with more than 10 technology companies either had no termination date or terminated in 2012. As a specific example, on December 29, 2009, Oracle amended its "No Hire List" to add CoreTech, Inc. – a company that sells hardware, develops and sells software, and provides other IT solutions and services. And, the Secret Agreement Oracle entered with CoreTech in December 2009 would not terminate until September 4, 2012. As part of Oracle's long-established business practice, Oracle continued to enter into new Secret Agreements with companies and add them its "No Hire List" well into 2012.

SAC ¶ 49.

Similarly, the SAC contains allegations about specific occurrences of continuing conduct:

> As another example, a former Senior Director at Oracle ended his employment with Oracle in 2014. At the end of his employment, that former Oracle employee asked Rivera Partners to help place him at another technology firm. Riviera Partners, however, informed him that it could not place this former Oracle employee because it had an agreement with Oracle not to perform job placement services for Oracle employees. On information and belief, Oracle had agreements in place up until October 2014 and after with various recruiting companies, including Riviera Partners, not to place Oracle employees with other companies.

*Id*. ¶ 55. The SAC likewise notes that the Plaintiffs, who were collectively employed at Oracle from December of 2008 through November of 2013, either applied to various technology companies for jobs and received no responses from companies who had "do not hire" agreements with Oracle or were never solicited by such companies. *Id*. ¶¶ 73-83.

This Court in *Garrison* also ruled that Plaintiffs failed to plead fraudulent concealment with the requisite particularity, by just making broad conclusory statements. *Garrison*, 2015 WL 1738352, at *8-9. The SAC cures that defect as well. Another new subsection has been added—paragraphs 84-105 of the SAC—that details at length acts of such concealment. Such acts include statements employee handbooks that it complied with antitrust laws and oral follow-up conversations with Oracle human resources personnel. *Id*. ¶¶ 84-91. Consistently with case law from this district, such acts also include statements in Oracle's annual filings with the Securities & Exchange Commission ("SEC") in 2008, 2010,  2011, 2012 and 2013 about how, in the software industry, there is "substantial and continuous competition for highly skilled business, product development, technical and other personnel" and how Oracle is impacted by such competition. *Id*. ¶¶93-94.  In addition, Plaintiffs in the SAC pointed to discussions they had where Oracle personnel repeatedly told them that compensation was determined competitively. *Id*. ¶97.

Finally, the SAC discusses how Oracle "no hire" lists were distributed to Human Resources personnel with the instruction not to forward them. *Id*. ¶100. One of the very documents proffered by Defendant in its request for judicial notice contains this warning.

DRJN Exh. 6 (Dkt. No. 111-6).

In sum, all of the concerns expressed by this Court about Plaintiffs' original complaint have been sought to be rectified in the SAC.

### B. Plaintiffs' Claims Are Timely.

#### 1. Plaintiffs Had No Notice Of Oracle's Conduct Until May of 2013.

As this Court noted in *Garrison*, the DOJ commenced an investigation of the recruitment practices of various companies that operated in Silicon Valley in 2009. *Garrison*, 2015 WL 1738352, at \*1. It is now known that Oracle was among those being investigated. The DOJ did not advise Oracle that it would be pursuing no case against it until October 29, 2014, after the original complaint in this matter was filed. *See* the accompanying "Plaintiffs' Request for Judicial Notice" ("PRJN"), Exh. A. The DOJ filed a civil action against Apple, Google, Intel, Adobe Systems, Pixar, and Intuit on September 24, 2010 and another action against Lucasfilm and Pixar on December 10, 2010. The Adobe complaint is DRJN Exh. 11 (Dkt. No. 111-11). The Lucasfilm complaint is PRJN Exh. B.  The two cases were settled by judgments entered, respectively, March 18 and June 3, 2011. "Final Judgment" (March 18, 2011) (Dkt. No. 17) in *United States v. Adobe Sys., Inc.*, No. 1:10-cv-01629-RBW (D.D.C.) ("*Adobe*");  "Order" (June 3, 2011) (Dkt. No. 7) in *United States v. Lucasfilm, Inc.*, No. 10-02220 (RBW) (D.D.C.) ("*Lucasfilm*"). PRJN Exhs. C-D; DRJN Exh. 12 (Adobe final judgment). The DOJ filed a third case against eBay on November 16, 2012, alleging unlawful restrictive hiring and antisolicitation agreements between it and Intuit. PRJN Exh. E. That case was settled in September of 2014, shortly before the initial complaint in this matter was filed. "Final Judgment" (Sept. 2, 2014) (Dkt. No. 66) in *United States v. eBay, Inc.*, No. 12-CV-05869-EJD-PSG (N.D. Cal.) ("*eBay*"). PRJN Exh. F; DRJN Exh. 13. All three final judgments contained provisions requiring the respective defendants to file with the United States for five years annual statements identifying and providing copies of employee hiring agreements with resellers or original equipment manufacturers, certain service providers or recipients or partners in "legitimate collaboration agreements" such as joint ventures and also to describe any known

violations of the judgments. The district court retained jurisdiction to enforce these and other terms. The obligations imposed by these judgments are thus ongoing. None of these complaints or final judgments reference Oracle.

Defendant contends that the Plaintiffs had constructive notice of its conduct in 2008 because Oracle's "no hire" list was published on its internal website. Oracle Br. at 14 & n.12. However, the documents it cites do not support the contention that Plaintiffs had access to them. They do not indicate whether the intranet posting was limited to specific personnel or protected by passwords or other features that precluded Plaintiffs' access to them. The January 23, 2008 e-mail from Gill to an Oracle Director (DRJN Exh. 5, Dkt. No. 111-5) is vague about what "website" is being referenced and whether anyone outside of Oracle's Human Relations Department could access it.  The December 29, 2009 "do not hire" list forwarded by Gill (DRJN Exh. 9, Dkt. No. 111-9) is similarly vague. By contrast, another document proffered by Defendant—a February 12, 2008 e-mail by David Nason, a Senior Recruiting Manager for Oracle, responding to Gill's circulation of a prior version of the "no hire" list (DRJN Exh. 6, Dkt. No. 111-6) that she said should be uploaded to an internal website—advised the "team": "FYI only. Please do not forward. Call me with any questions." This document indicates that access to the Oracle "no hire" list was severely restricted; Oracle's contrary reading of it raises a dispute that cannot be resolved on the pleadings.[1] And while the Oracle "US Manager Resource Guide" (DRJN Exh. 10, Dkt. No. 111-10) does refer to Oracle's "no hire" list, there is no indication Plaintiffs ever saw this document and the SAC specifically alleges that knowledge of the Secret Agreements was restricted to the "smallest possible group within Oracle." SAC ¶101.

Moreover, even if the "no hire" list was freely accessible to every employee within Oracle, it did not fully disclose the Secret Agreements that Oracle had with other high

---

[1] As one court has noted, dismissals should not be granted where a claim is based in part on a document subject to multiple different interpretations. *See Flying J, Inc. v. TA Operating Corp.*, No. 1:06-CV-30-TC, 2007 WL 4165749, at *2-3 (D. Utah Nov. 20, 2007).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

technology companies like Google or IBM. The SAC notes this: "[f]urther, a majority of the Secret Agreements with companies were unwritten gentleman's agreements, and were carefully communicated mostly over the phone. Most times, these Secret Agreements were evidenced through carefully worded mails. Also, the CEOs namely, Safra Catz, could add a company that would be subject to the Secret Agreements with an oral directive on a moment's notice." *Id*. ¶ 107.

As a consequence, the SAC specifically alleges that the first time Plaintiffs became aware of Oracle's Secret Agreements was on May 17, 2013 when Google's "Special Agreement Hiring Policy"—which identified Google as having a "Restricted Hiring" list that included Oracle was placed on the public record in the *High-Tech* case. *Id*. ¶106.

## 2. The Statutes of Limitations Have Been Tolled By The Pendency of Governmental Proceedings.

One point that this Court was not asked to consider in ruling on the timeliness of the claims alleged in the original complaint was the tolling effect of the DOJ proceedings. Plaintiffs ask the Court to consider it now.

Pursuant to 15 U.S.C. § 16(i),

Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, but not including an action under section 15a of this title, the running of the statute of limitations in respect to every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter: *Provided, however*, That whenever the running of the statute of limitations in respect of a cause of action arising under section 15 or 15c of this title is suspended hereunder, any action to enforce such cause of action shall be forever barred unless commenced either within the period of suspension or within four years after the cause of action accrued.

Even if one assumes *arguendo* that Oracle's unlawful conduct could have been discovered by Plaintiffs some time before May of 2013, Plaintiffs believe that the initiation of the DOJ's investigation of Microsoft and other firms in the high-tech industry itself was a "proceeding" sufficient to toll the limitations period pursuant to Section 16(i). *See Dungan v. Morgan Drive-Away, Inc*., 570 F.2d 867, 871 (9th Cir.), *cert. denied*, 439 U.S. 829 (1978) ("[t]he initiation of an investigation or a decision to prosecute more comfortably fits the

statutory language than does empanelling the grand jury"). Even if the Court disagrees with that position, at the very least, Plaintiffs contend that the running of the statute of limitations was tolled for two periods: (1) slightly over 20 months—from September 24, 2010 (the date on which the *Adobe* action was filed) to June 3, 2012 (one year after the date of the final judgment in *Lucasfilm*) and (2) for another 20 months (November 16, 2012 to September 2, 2014) during the pendency of the *eBay* case. As one court has noted, "the statute of limitations, once tolled by governmental action under § 16(i), remains tolled until the last action against all defendants is resolved." *In re Scrap Metal Antitrust Litig.*, No. 1:02 CV 0844, 2006 WL 2850453, at *22 (N.D. Ohio Sept. 30, 2006) ("*Scrap Metal*") (footnote omitted).

Oracle may contend that Section 16(i) does not apply because the government proceedings involved different claims and different parties. Those arguments cannot succeed. All a private plaintiff needs to do is base his or her suit "in whole or in part upon the matter complained in the Government suit." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 335-36 (1971). To satisfy this test, the claims in the government suit must bear a "real relation" to the claims in the private suit. This does not mean that the two sets of claims must be identical or brought against the same parties. "The private plaintiff is not required to allege that the same means were used to achieve the same objectives of the same conspiracies by the same defendants." *Leh v. Gen. Petroleum Corp.*, 382 U.S. 54, 59 (1965) ("*Leh*"). Indeed, as the Supreme Court noted in *Leh*, Section 16(i) should be interpreted very broadly. *Id.* at 58-59. As the Ninth Circuit said in *Chipanno v. Champion Int'l Corp.*, 702 F.2d 827, 832-33 (9th Cir. 1983), "[i]f the necessary overlap is present, the purpose of the statute is served though there are differences in the allegations of the two complaints as to the means used, the defendants named, and the time period and geographic area involved." *See id.* at 832 (private complaint alleged a conspiracy that included the objectives, means, time span and geographic scope of the conspiracy alleged by the government); *Hinds County, Miss. v. Wachovia Bank, N.A.*, 885 F. Supp. 2d 617, 623-24 (S.D.N.Y. 2012) (government indictment was against a different company than the one newly identified in private antitrust suit and did not allege antitrust

violations); *Scrap Metal*, 2006 WL 2850453, at *22 (fact that conspiracies in private and governmental suits might be somewhat different and that defendant in private suit was not involved in government suit deemed immaterial).

Here, it is undisputed that Oracle was part of the governmental investigation into wage suppression by high-tech companies, even though it was not ultimately sued by DOJ. The objectives of the conspiracy of which it is accused were the same as those in *Adobe* and *Lucasfilm*. The means—mutual non-solicitation and non-hiring agreements, implemented in part through "no hire" lists--is also the same. Several of the entities that DOJ did sue--Google, Adobe, Intuit—are accused of having conspired with Oracle. There is an overlap in the time periods of the alleged conspiracies. All of this, taken together, is more than sufficient to trigger the tolling provisions of Section 16(i). *See also Garrison*, 2015 WL 1849517, at *1 (noting that there is substantial factual overlap between the instant case and the alleged conspiracies in *High–Tech*).

### 3.   The Discovery Rule Applies To Plaintiffs' UCL Claims To The Extent They Are Based On Defendant's Deceptive Practices.

As an additional point, this Court in *Ryan v. Microsoft Corp.,* No. 14-CV-04634-LHK, 2015 WL 1738352 (N.D. Cal. Apr. 10, 2015) held that the discovery rule did not apply to Plaintiffs' UCL claims.[2] It acknowledged that the California Supreme Court's decision in *Aryeh* made the discovery rule applicable to some types of UCL claims, but found that "Plaintiffs have failed to identify any circumstances warranting a deviation from the default common law last element accrual rule." *Id*. at *16. It is respectfully submitted that the additional allegations in the SAC should cause the Court to reach a different conclusion here.

The California Supreme Court in *Aryeh* recognized that "a UCL deceptive practices claim should accrue only when a reasonable person would have discovered the factual basis for

---

[2] In *In re Animation Workers Antitrust Litig*., No. 14-CV-04062-LHK, 2015 WL 1522368, at *11-12 (N.D. Cal. Apr. 3, 2015) ("*Animation Workers*"), this Court similarly held that the "discovery rule" of accrual did not apply to federal and state antitrust and UCL claims, declining to follow *Fenerjian v. Nongshim Co.,* No. 13-CV-04115-WHO, 2014 WL 5685562 (N.D. Cal. Nov. 4, 2014). Plaintiffs respectfully disagree with that ruling and seek to preserve the issue in the event of an appeal.

such a claim." 55 Cal. 4th at 1195 (internal quotations omitted). Here, the FAC is replete with many more allegations of Microsoft's deceptions with respect to its employees on the issue of the Secret Agreements, including use of private emails or having discussions concerning Secret Agreements conducted by telephone, oral and written false statements to employees, false statements in SEC filings, limitation of access to the "no hire" list and treatment of that list as highly confidential. SAC ¶¶ 84-104. The SAC repeatedly alleges that Oracle engaged in deliberately misleading conduct. *Id.* ¶ 97. In the UCL claim contained in the SAC, it is alleged that Defendant's conduct was "fraudulent." *Id.* ¶ 127. These allegations are sufficient to trigger application of the discovery rule under the UCL.

### 4.    Plaintiffs Have Adequately Pled A Continuing Violation.

As explained above, Plaintiffs have added numerous allegations to the SAC asserting a continuing violation. This Court previously found no allegations of conduct during the limitations period, only an assertion that Microsoft entered into anti-solicitation and restricted hiring agreements in May of 2007. *Garrison*, 2015 WL 1849517, at *7.

Oracle says nothing has changed in the SAC, asserting that all Plaintiffs now allege are reaffirmations or expansions of existing agreements. Oracle Br. at 9. However, in *Samsung Electronics Co. v. Panasonic Corp.*, 747 F.3d 1199 (9th Cir. 2014), *cert. denied*, 135 S.Ct. 1157 (2015), the Ninth Circuit held that even if a license entered into in 2006 during the limitations period was "merely a restatement" of a pre-limitations period 2003 license, the application of the prior license to Samsung when it began to make SD storage cards was an overt act that restarted the limitations period. 747 F.3d at 1204. As it noted, "[w]e have repeatedly held that acts taken to enforce a contract were overt acts that restarted the statute of limitations." *Id.  See Columbia Steel Casting Co. v. Portland General Elec. Co.*, 111 F.3d 1427, 1444-45 (9th Cir. 1996), *cert. denied*, 523 U.S. 1112 (1998) (refusal to wheel electricity in accordance with pre-limitations contract restarted statute of limitations); *Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1300-1 (9th Cir.), *cert. denied*, 479 U.S. 886 (1986) (steering of customers to preferred souvenir shops during the limitations period in

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

furtherance of a pre-limitations agreement restarted the statute of limitations). The pre-limitation Secret Agreements were not set in stone forever. They had to be continuously enforced through communication and action, renewed when they expired and/or expanded to other companies as appropriate. Each such act during the limitations period, as alleged in the SAC, restarted the statute of limitations.

Plaintiffs also allege that they applied to companies with which Oracle had Secret Agreements during the limitations period and were not invited to interview or were otherwise not solicited. SAC ¶¶ 73-82. They are entitled to the inference at the pleading stage that this was because of those agreements. Oracle claims that those refusals were not its doing. Oracle Br., pp. 11, 14 n.13. But the SAC alleges a conspiracy that encompassed restrictive hiring. To the extent Oracle's coconspirators engaged in such conduct as to Plaintiffs, Oracle is jointly and severally liable for their actions. *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980) ("[i]f Beltz can establish the existence of a conspiracy in violation of the antitrust laws and that appellees were a part of such a conspiracy, appellees will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy, regardless of the nature of appellees' own actions."); *In re K-Dur Antitrust Litig*., 338 F. Supp. 2d 517, 538 (D.N.J. 2004) ("a co-conspirator is liable for all acts committed in furtherance of a conspiracy, regardless of when it entered the conspiracy").

Oracle also attempts to rebut specific instances of misconduct alleged in the SAC (Oracle Br. at 8-10), but its arguments are more suited to a motion for summary judgment under Fed. R. Civ. P. 56 than a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

For example, Plaintiffs alleged that in December of 2009, Oracle ratified the "no hire" list by adding new companies like CoreTech, the agreement with which continued into 2012. SAC ¶ 49.  Oracle claims that no specific conduct with respect to the agreement with CoreTech is pled and its terms were not spelled out. But that degree of detail is not required to be pled and, in any event, the terms of the CoreTech agreement can be found in the December 29, 2009 "do not hire" list that the Defendant has asked the Court to judicially notice. DRJN Exh. 9

(Dkt. No. 111-9 at 8). Similarly, Plaintiffs cited agreements between Oracle and recruiters, such as Riviera Partners, not to place Oracle employees with other companies, as reflected in the experience of a Senior Director at Oracle who left the company in 2014. SAC ¶ 55. Oracle asserts that these allegations are too vague, but, again, the case law does not require the specificity that Defendant now seeks. *See Schenker AG v. Société Air France*, No. H-CV-04711 JG VVP, 2015 WL 1951422, at *3 (S.D.N.Y. Apr. 23, 2015) (allegations of meetings between two airlines after February of 2006 and use of collusive surcharges that led to inflated prices sufficed).[3]

### 5. The Continuous Accrual Doctrine Under California Law Also Applies.

In *Ryan v. Microsoft Corp*., No. 14-CV-04634-LHK, 2015 WL 1738352 (N.D. Cal. Apr. 10, 2015), this Court applied what it called the "default accrual rule"—the "last element rule"—to Plaintiffs' California law claims. *Id*. at *16. It therefore held that Plaintiffs' claims began to accrue in 2007 and were time-barred unless either a continuing violation or fraudulent concealment were adequately pled. *Id*. Plaintiffs assume that it might reach a similar result here with respect to their UCL claims. But even in cases where no continuing violation is pled, California recognizes a doctrine of "continuous accrual." As the California Supreme Court explained in *Aryeh*, "[t]he theory is a response to the inequities that would arise if the expiration of the limitations period following a first breach of duty or instance of misconduct were treated as sufficient to bar suit for any subsequent breach or misconduct; parties engaged in long-standing misfeasance would thereby obtain immunity in perpetuity from suit even for recent and ongoing misfeasance." *Aryeh*, 55 Cal. 4th at 1199, 151 Cal. Rptr. at 838. The doctrine is unlike that of a continuing violation because the plaintiff can seek damages only during the limitations period. *Id*. at 1200, 151 Cal. Rptr. at 839. In applying this doctrine in *Aryeh*, the California Supreme Court found a continuing obligation not to impose unfair charges in monthly bills that was susceptible to recurring breaches. *Id*.  Here, by analogy, there

---

[3] Plaintiffs also asserted allegations about Catz's monitoring and enforcement of "no hire" agreements. By stipulation, the parties agreed to strike those allegations from the SAC and Plaintiffs do not rely on them in this opposition.

is a continuing obligation not to collude with competitors to restrict free competition for engineers and managers that was susceptible to being breached each time a Secret Agreement was entered into or renewed or reaffirmed. Under California law, even if the "last element" of the practice was in place in 2007 and no continuing violation occurred, Plaintiffs can still recover damages from recurring breaches during the limitations period.

### 6.  Plaintiffs Have Adequately Pled Fraudulent Concealment.

This Court in *Garrison* also instructed Plaintiffs to do a better job of pleading fraudulent concealment. *Garrison*, 2015 WL 1849517 at *9. They have done so in the SAC. They have pled misleading oral and written statements issued by Oracle during the limitations period, including false statements in annual reports. These are the same types of averments found to be satisfactory in *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 309192, at *16 (N.D. Cal. Jan. 21, 2014) ("*Batteries*") ("[t]he complaints allege public, putatively false statements by various defendants affirming their compliance with applicable antitrust laws as well as the existence of vigorous price competition in the lithium ion battery market. Nothing in either complaint suggests that it would have been unreasonable for Plaintiffs to take these statements at face value prior to the May 2011 disclosure of the Justice Department's investigation into alleged price-fixing in Defendants' industry.") (citations omitted).  The Court has cited this opinion in the past in deciding the sufficiency of fraudulent concealment allegations. *See Animation Workers*, 2015 WL 1522368, at *16. Plaintiffs have also pled efforts by Oracle to limit access to and circulation of documents reflecting its secret agreements, another type of evidence relied upon by the court in *Batteries*, 2014 WL 309192, at *16 ("[p]laintiffs allege with particularity a variety of mechanisms by which Defendants kept secret their allegedly collusive meetings and other contacts, such as: instructing the recipient of documents or emails to destroy, delete, or discard them after reading, instructing personnel to refrain from memorializing conversations") (citations omitted). And Plaintiffs have pled attempts by Oracle in the DOJ proceedings and follow-on private litigation to conceal portions of key documents from public scrutiny through excessive

redactions and overbroad confidentiality requirements (SAC ¶ 104), a type of evidence this Court said in *Animation Workers* that it might take into account if it were pled. *Animation Workers*, 2015 WL 1522368, at *16 n.15.

Oracle responds by contending that the alleged misleading statements at issue in *Batteries* bore a much closer relationship to the claimed conspiracy than the ones at issue here. Oracle Br. at 15-16. But the SEC statements cited in the SAC directly relate to the claimed conspiracy: "[i]n the software industry, there is substantial and continuous competition for highly skilled business, product development, technical and other personnel. In addition, acquisitions could cause us to lose key personnel of the acquired companies or at Oracle." This statement was misleading in light of the fact that the Secret Agreements were inconsistent with the notion of "substantial and continuous competition" and that Oracle was at risk of losing "key personnel" to all of its various competitors. SAC ¶ 93.

Moreover, the SAC is replete with other allegations about how Oracle misled the Plaintiffs themselves with respect to the subject matter of the alleged conspiracy:

> Plaintiffs also wanted to know how the compensation and commission structure worked at Oracle, and they referenced the employee handbook for that purpose as well. After reading the handbook, Plaintiffs believed they had a firm understanding of the compensation structure and the Oracle employee handbook led them to believe that Oracle complied with all laws. Moreover, Plaintiff Garrison talked with an Oracle human resource employee who informed him, falsely, that Oracle's commission structure was competitive with other technology companies. Likewise, in addition to the public statements about the competitiveness of Oracle's compensation structure, Plaintiff Hari was also directed by a senior executive to inform his team of subordinates that their compensation levels at Oracle were highly competitive and that they should be very pleased with the level of compensation Oracle offered. At the time, Mr. Hari did not know this statement was false and that Oracle was also actively suppressing compensation levels by way of its Secret Agreements with competitors. These affirmative falsehoods led Plaintiffs to believe that their salaries were driven by a competitive market place and his work performance and not by a series of anti-competitive agreements.
>
> ****
>
> Many times during the Class Period, Plaintiffs and other Class members attempted to learn the truth about Oracle's compensation and retention practices. Class members repeatedly asked Oracle about how compensation was determined and what steps Oracle was taking to retain and attract talented employees, but Oracle's misleading responses that compensation was "competitive" thwarted those efforts, as illustrated above.

*Id*. ¶¶ 90, 97. These misleading statements continued even after Garrison's original complaint

was filed:

> Oracle's denials still go on to this day. On or about October 14, 2014, Oracle spokeswoman, Deborah Hellinger, stated "Oracle was deliberately excluded from all prior litigation filed in this matter because all the parties investigating the issue concluded there was absolutely no evidence that Oracle was involved." Hence, as of October 14, 2014, Oracle was still trying to actively conceal its involvement in the conspiracy outlined above. This statement was false and was made to mislead the class and members of the public.

*Id.* ¶ 108.

Thus, Oracle's alleged acts of concealment relate directly to the claimed conduct at issue in the SAC.

### C.   Plaintiffs Have Adequately Pled A Conspiracy.

Oracle's next argument is that Plaintiffs have failed to plead a plausible conspiracy. Oracle Br. at 19-23. The argument rests on several premises. First, it contends that Plaintiffs have not pled Oracle's participation in the overarching conspiracy found in the High-Tech case, but has instead have pled at best "unrelated agreements ancillary to legitimate business collaborations." *Id.* at 20. Next, it contends that the agreements Plaintiffs have pled are permissible under the guidelines established by the final judgments entered into by the DOJ in the Adobe case. *Id.* at 20-22. The "do not hire" list is described as merely a mechanism for tracking these lawful agreements. *Id.* at 22. It goes on to contend that Oracle's policy of not soliciting the employees of its business partners is unilateral and thoroughly permissible. *Id.* at 21. Finally, Oracle contends that a Rule of Reason analysis, not a *per se* rule of illegality, is the appropriate standard to apply here and that all of the challenged agreements are inherently reasonable. *Id.* at 22-23. Again, these arguments are an open invitation to the Court to decide the merits of this case at the pleading stage. That offer should be categorically rejected.

Like the plaintiffs in *High-Tech*, the Plaintiffs here have alleged a conspiracy that plausibly harms them and the putative class they seek to represent:

> Plaintiffs have asserted that their salary and mobility were suppressed by Defendants' agreements not to cold call, and that the alleged agreements were entered into to suppress competition for skilled labor. Plaintiffs have specifically alleged that they were injured by Defendants' alleged anticompetitive conduct; have explained the means by which Defendants allegedly caused this injury; and have suggested how this injury should be quantified. In alleging that Defendants conspired to fix salaries at artificially low levels, Plaintiffs have alleged "an example of the type of injury the antitrust laws are meant to

protect against." Plaintiffs have further alleged that Defendants' attempts to suppress competition had the intended "effect of fixing the compensation of [Plaintiffs] at artificially low levels." Plaintiffs have thus also alleged that their injury is a direct result of Defendants' conduct.

856 F. Supp. 2d at 1123 (citations omitted).

The allegations of the SAC tie Oracle's conduct to similar conduct alleged in *High-Tech* against Google, Intuit, and Adobe. As noted above, Oracle's name is on the "restricted Hiring List" that was a prominent part of the evidence in the High-Tech case. As for the argument that all Plaintiffs have shown are a group of "unrelated" agreements, a similar contention was advanced and rejected by this Court in *High-Tech*. There, six bilateral restrictive hiring agreements were alleged, but the Court found a plausible claim of an overarching conspiracy, given that they involved closely connected high technology companies who acted in secret over a span of a couple of years. All of that suggested that "these agreements resulted from collusion, and not from coincidence." *High-Tech*, 856 F. Supp. 2d at 1120. This was true even though the defendants sued in *High-Tech*--Adobe, Apple, Google, Intuit, Lucasfilm and Pixar—had diverse and distinct types of businesses.

The contention that the agreements at issue here are lawful because they fall within the guidelines of prior DOJ consent decrees is simply not one that can be decided on a Rule 12(b)(6) motion, but can only be resolved on summary judgment or at trial, after full discovery has been obtained. Similarly unavailing is Oracle's argument that its conduct is permissible under the Rule of Reason. As this Court noted in *High-Tech*, it "need not decide now whether *per se* or rule of reason analysis applies. Indeed, that decision is more appropriate on a motion for summary judgment." 856 F. Supp. 2d at 1122.

### D.     Plaintiffs Have Adequately Pled Their State Law Claims.

**UCL**. In *High-Tech*, this Court dismissed UCL claims *in toto* on the ground that the higher wages Plaintiffs could have obtained in the absence of the alleged conspiracy were a mere expectancy rather than a vested interest. *Id*. at 1124-25. While Plaintiffs respectfully disagree with that ruling, they expect that the Court will reach the same result here.  However, unlike the situation in *High-Tech* (*id*. at 1124), Plaintiffs have not abandoned any claims for

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

declaratory or injunctive relief and thus their UCL claim remains as to those forms of relief.

SAC, Prayer for Relief ¶ 7.

    **Section 16600**. Defendant's argument on this point is that Plaintiffs lack Article III standing to pursue a Section 16600 claim because they are no longer employed by Oracle. This argument ignores the following allegations in the FAC:

> As referenced above, Plaintiffs were collectively employed by Oracle from December 2008 through November 2013. Up until 2015, Plaintiffs continued to feel the impact of Oracle's anti-trust violations.

> After Plaintiff Garrison left Oracle, he applied to many technology companies, including Google, Intuit, Hewlett-Packard, and Xerox, that were part of the conspiracy at some time from 2007 through 2015. But, each time Mr. Garrison applied for a job during the four year time frame of 2010 through 2015, the aforementioned technology companies enforced their Secret Agreements and "no-hire" agreements and refused to offer him any open positions.

> Although well qualified, none of the technology companies that were part of the conspiracy would return calls, request Mr. Garrison to interview, and otherwise denied Plaintiff a position. In sum, Mr. Garrison was unable to obtain gainful employment and thus was injured.

> Plaintiff Van Vorst was similarly impacted by Oracle's anti-trust violations, both during her employment through August 2012, and after leaving Oracle. To her knowledge, during her employment with Oracle, Ms. Van Vorst was never directly solicited by any of the tech companies with whom Oracle had entered into the Secret Agreements (e.g., Google, Adobe, IBM, Intuit, etc.).

> Additionally, toward the end of her employment and thereafter, Ms. Van Vorst submitted numerous applications (approximately 15 resumes per day) to technology companies, including those with which Oracle had entered a Secret Agreement. The resumes Ms. Van Vorst submitted were for advertised job openings that fit her job experience and qualifications. But she never received any call-backs, nor any interview opportunities, nor any job offers from said companies.

> After nearly a half year of seeking employment, Ms. Van Vorst finally received employment at a company that was not in the tech industry and that was not a party to any of the Secret Agreements. When she finally received a job offer after leaving Oracle it was for less compensation than she would have received had she not been denied an equal opportunity to attain employment at the number of tech companies with whom Oracle had Secret Agreements.

> Likewise, Plaintiff Hari was impacted by Oracle's anti-trust violations, both during his employment through November 2013, and after leaving Oracle. Indeed, during his entire employment with Oracle, he never received any compensation raises. Additionally, to his knowledge, during his employment at Oracle, Mr. Hari never received any direct solicitations for employment from any of the tech companies with whom Oracle had entered into Secret Agreements.

> Additionally, when Plaintiff Hari did apply to certain of the tech companies with

whom Oracle had Secret Agreements (e.g., Google and Adobe), he received responses from said companies informing him that he was very qualified for the position but that they regretted to inform him they were unable to offer him the position. For example, when he applied to certain of the tech companies with whom Oracle had a secret agreement, even after the hiring partners at said companies informed him that he was a good fit and well qualified for the position, he later learned from the companies' human resources department that they could not offer him the position.

SAC ¶¶ 74-81. These allegations amply support claims for declaratory and injunctive relief under Section 16600.

In *High-Tech*, the plaintiffs were all former employees of various defendants. 856 F. Supp. 2d at 1108. An Article III challenge was raised there as well. This Court rejected that challenge out of hand, saying:

Plaintiffs meet the requirements for Article III standing: (1) injury in fact; (2) causal connection; (3) redressability. *Takhar v. Kessler*, 76 F.3d 995, 999–1000 (9th Cir.1996) (internal quotations omitted). Plaintiffs allege that their salaries were artificially reduced as a result of Defendants' alleged anticompetitive conduct and that their injury can be redressed through the payment of damages should Plaintiffs establish liability.

856 F. Supp. 2d at 1123 n.11. All of these allegations establish injuries that continued after Plaintiffs left the employ of Oracle.

Subsequently, in *Garrison*, this Court expanded on this footnote even though the plaintiff is a former employee of Oracle who sued with respect to non-solicitation and restrictive hiring agreements, alleging both antitrust and Section 16600 claims:

Oracle fails to appreciate the gravamen of Plaintiff's alleged injury: that Oracle and Google engaged in a conspiracy "to fix and suppress *the compensation* of their employees," Plaintiff included, "by way of [the] Restricted Hiring Agreement." Compl. ¶ 2 (emphasis added); *see also id.* ¶ 31 ("Oracle entered into, implemented, and policed the Restricted Hiring Agreement with the knowledge of the overall conspiracy, and did so with the intent and effect of fixing the compensation of the employees of participating companies at artificially low levels."); *id.* ¶ 32 (alleging that Plaintiff "was harmed by the Restricted Hiring Agreement" through "elimination of competition and suppression of compensation and mobility"); *id.* ¶ 52 (claiming that "Defendant's conduct injured and damaged Plaintiff ... by suppressing compensation to levels lower than the [employees] otherwise would have received in the absence of the Restrictive Hiring Agreements"). Plaintiff, who worked for and was paid by Oracle from December 2008 to June 2009, alleges that Oracle's anticompetitive conduct artificially depressed his compensation during that period. Plaintiff, therefore, has alleged a cognizable injury for purposes of Article III.

2015 WL 1849517, at *6.

Similar allegations are found in the present complaint, as noted above. For the same reasons as those expressed in *Garrison* and *High-Tech*, Article III injury is pled sufficiently.

Plaintiffs therefore suffered injury in fact causally related to the claimed conspiracy that is redressable in part through a declaration of the illegality of Oracle's conduct and an injunction preventing that conduct from continuing or recurring.

## IV.   CONCLUSION.

For all of the foregoing reasons, Defendant's motion to dismiss should be denied.

Dated: July 23, 2015                    Respectfully submitted,

                                        /s/ David R. Markham
                                        JEFFREY L. HOGUE, ESQ. (SBN 234557)
                                        TYLER J. BELONG, ESQ. (SBN 234543)
                                        BRYCE A. DODDS, ESQ. (SBN 283491)
                                        HOGUE & BELONG
                                        430 Nutmeg Street, Second Floor
                                        San Diego, CA 92103
                                        Telephone No: (619) 238-4720
                                        Facsimile No: (619) 270-9856
                                        jhogue@hoguebelonglaw.com
                                        tbelong@hoguebelonglaw.com
                                        bdodds@hoguebelonglaw.com

                                        DAVID R. MARKHAM, ESQ. (SBN 071814)
                                        PEGGY REALI, ESQ. (SBN 153102)
                                        JANINE MENHENNET, ESQ. (SBN 163501)
                                        MAGGIE K. REALIN, ESQ. (SBN 263639)
                                        THE MARKHAM LAW FIRM
                                        750 B Street, Suite 1950
                                        San Diego, CA 92101
                                        Telephone No.: (619)399-3995
                                        Facsimile No.: (619) 615-2067
                                        dmarkham@markham-law.com
                                        preali@markham-law.com
                                        jmenhennet@markham-law.com
                                        mrealin@markham-law.com

                                        MICHAEL P. LEHMANN (SBN 77152)
                                        BONNY E. SWEENEY (SBN 176174)
                                        CHRISTOPHER L. LEBSOCK (SBN 184546)
                                        HAUSFELD LLP
                                        600 Montgomery Street
                                        Suite 3200
                                        San Francisco, CA 94111
                                        Telephone: (415) 633-1908
                                        Facsimile: (415) 358-4980
                                        mlehmann@hausfeld.com
                                        bsweeney@hausfeld.com
                                        clebsock@hausfeld.com

                                        *Attorneys for Plaintiffs*